**STATE**

v.

**Theodore GRIFFIN.**

**No. 88–480–C.A.**

Supreme Court of Rhode Island.

Dec. 14, 1989.

James E. O'Neil, Atty. Gen., Annie Goldberg, Sp. Asst. Atty. Gen., for State.

Richard Casparian, Public Defender, Paula Rosin, Barbara Hurst, Asst. Public Defenders, for defendant.

**OPINION**

FAY, Chief Justice.

This case comes before this court on appeal by the defendant from a Superior Court jury conviction of robbery and first-degree sexual assault. The defendant claims that the trial justice committed error by (1) admitting video-taped testimony of two out-of-state physicians taken while the defendant was absent from the courtroom, (2) admitting certain photographs taken of the victim after the incident, and (3) excluding evidence of the victim's blood-alcohol level. We deny the defendant's appeal and affirm the Superior Court conviction.

On January 18, 1985, defendant, Theodore Griffin (Griffin), was indicted by a Providence County grand jury on one count of robbery and one count of first-degree sexual assault. Donna M.,[1] the complaining witness, took the stand at trial and testified concerning the incident that took place in South Providence on September 14, 1984.

On the evening of September 13, 1984, Donna had a friend of the family drop her

---

1. This is a fictitious name. In all cases of sexual abuse and molestation this court changes the name of the victim to protect his/her identity.

off at the Marriott hotel in Providence,[2] where she met her boyfriend for drinks. At approximately 1:30 a.m. they decided to leave because it was late and both were tired. They began to argue in the car, whereupon Donna told him to stop the vehicle. Her boyfriend having stopped, she got out of the car, even though she did not know where she was. She began to walk and realized she might be "in trouble" when she saw that she was on Broad Street. She called the family friend who had driven her to the hotel earlier and asked him for a ride. He told her to walk a little further to find out what part of Broad Street she was on and call him back.

As she started walking, she saw "a little red car" slow down. At the other end of the street she also saw three men walking toward her. She went over to the car and asked the man in the car if he would give her a ride to Chalkstone Avenue if she gave him $5. Donna testified that she had not flagged down the car but that the driver, defendant, had stopped because he had spotted her. She asked him repeatedly if he would take her straight home and not try anything, and when he assured her he would, she gave him $5 and got into the car.

Donna testified that after she got into the car, everything seemed all right until defendant suddenly went up a side street. When Donna protested and asked him where he was going, he started laughing. After going down another side street, defendant stopped the car. Donna now noticed that there was no handle on the door of the passenger side of the car. The defendant dragged her by the arm out through the driver's side and took her up some porch stairs. He told her to give him her pocketbook, and when she refused, he punched her in the face, knocking her down the stairs. She was unconscious for a while, and after she came to, she saw defendant going through her pocketbook in which she had $45 and about $15 in food stamps. When she got up, he told her to take off her clothes. Reluctant, she hesitated, but he insisted that she take every-

thing off and punched her. The defendant kept punching her in the face and kicking her and using racial obscenities.

Next, Donna testified, he dragged her down the street past three or four houses into a driveway. The area was dilapidated and deserted. By now Donna was crying and pleading with defendant to leave her alone. The defendant told her to "shut up" and raped her. After he raped her, he kept kicking her and swearing at her. He told her to lie still and not to try to get help because he was coming back every half hour to check on her. Donna said that although he then walked away, as she dragged herself to the edge of the house, she saw defendant come back. He tried to force her to perform fellatio then threw her back onto the ground. He told Donna to take off all her jewelry and put it in his hat. When she gave it to him and told him it was costume jewelry, he threw it away. Donna testified that throughout the whole incident he did not stop kicking or punching her. Before he left, he told her, "[D]on't move[,] I will be back in the morning for your body." After she heard him start his car and drive off, Donna managed to crawl to the front of the house and ring a doorbell, but no one came out. She dragged herself across the street and rang a few more doorbells. Finally someone called for an ambulance, and she was taken to Rhode Island Hospital.

At the hospital Donna gave a complete description of defendant to the police, including details about the clothes he was wearing and his car (a shabby red Pinto). In the afternoon of September 14, 1984, Detectives Timothy O'Brien and Paul Fitzgerald of the Providence police department drove around South Providence looking for defendant. At approximately 6:30 p.m. they stopped one red Pinto that matched Donna's description. The person driving was Karen Griffin, but the car was registered to defendant, Theodore Griffin. Detective O'Brien testified that he arranged a photo display with defendant's picture in it and showed it to Donna at the hospital. When Donna picked out defen-

---

**2.** This man was not available as a witness at trial because he died in January 1987.

dant's photograph, the detective obtained an arrest warrant. The defendant was arrested at his apartment, and the clothing he was wearing the night before was seized. Donna later identified the clothes from her hospital bed.

The defendant testified that on the night in question, he was driving his red Pinto along Broad Street when Donna flagged him down and asked for a ride. She offered to give him $5 for the ride when he told her "cars don't run on air." According to defendant she directed him to a house on Bogman Street where drugs were sold. When this house was found to be closed, she wanted to go to a housing project in Pawtucket, but defendant refused. She became upset, voiced a racial slur, and slapped him. He told her to get out of the car, walked around to open the door, and threw her on the ground. Since "she was still getting [o]n [his] case a little bit," he beat her up. He tried to start the car then, but she was standing in front of the car, so he got out. He said that he never demanded she take off her clothes but that she took them off herself, asking him if that was what he wanted. He thought she wanted sex, but he stated that that was not what he wanted at all.[3] Because he felt "hurt" that she was doing this to him and he was "helping the girl out," he started hitting her again with his hands and feet.

The defendant left but came back because he forgot his car keys and then started arguing with Donna again. She took a swing at him, he asserted, so he threw her to the ground. She grabbed his leg, and when he finally "pulled her off [his] leg," he started the car and left. When asked on cross-examination if any other woman had ever taken off her clothes in the middle of the sidewalk and asked him to have sex with her, defendant answered that this had not happened before.

Regarding her pocketbook, Griffin testified that she had thrown it at him. The contents scattered all over, but, he stated,

he did not do anything with those items. He only looked at her picture.

On November 2, 1987, the jury returned a guilty verdict on the charge of robbery and first-degree sexual assault. The defendant's motion for a new trial was denied on November 10, 1987. Griffin was sentenced to life in prison on each count. The defendant filed a notice of appeal on January 5, 1988.

I

The defendant's first argument concerns the admissibility of video-taped testimony of Doctors Robert A. Sarlo and Fernand Parent III, taken on August 5 and 6, 1987, when defendant was absent. The defendant contends that allowing the jury to view the video-taped testimony of Doctors Sarlo and Parent violated his constitutional right to confront witnesses guaranteed under the United States and Rhode Island Constitutions. U.S. Const. Amend. VI, XIV; R.I. Const. art. I, § 10.

The record indicates that Griffin was present in court on August 4, 1987, when the justice heard testimony in connection with defendant's pretrial motions to suppress various evidence, including Griffin's police statement, the complainant's identification testimony, and tangible evidence (the clothing defendant was wearing on the night in question) seized by the police. The justice announced at the end of the hearing that they would continue the next morning at 9:30 a.m.

The next morning defendant did not appear in court. Since defendant's attorney did not know where he was, the court issued a warrant for his arrest. The prosecution's motion to video tape the deposition of Dr. Sarlo (the resident gynecologist who treated Donna at Rhode Island Hospital), who was flying in from Florida that afternoon, was granted, although the circumstances surrounding defendant's absence were unknown. The defendant's attorney was afforded ample opportunity to cross-examine the witness.

---

3. When in custody he admitted in his statement to the police (dated September 15, 1984) that he had had intercourse with her and had her perform fellatio on him, but he claimed that she had wanted to make love and was "all over me." Griffin did not admit to any sexual acts at trial.

On August 6, 1987, Dr. Fernand Parent was called to the stand and his testimony was also video taped. Doctor Parent, a resident physician in the trauma unit at the time Donna was brought to Rhode Island Hospital, had moved to Arizona the month before. Again, defense counsel had the opportunity to cross-examine the witness.

On October 21, 1987, after defendant was apprehended, the warrant was canceled and the case was assigned to the trial justice for recommencement of trial. The pretrial hearing resumed on October 26, 1987, with defendant present. On October 27, 1987, the state requested a ruling on the admissibility of the testimony of Doctors Sarlo and Parent at trial. Before the commencement of trial on October 28, 1987, the court ruled the video-taped depositions admissible at trial. In doing so, the court inferred that defendant voluntarily absented himself from the courtroom since no evidence was offered to the contrary. The defendant was afforded an opportunity to view the tapes with his counsel prior to their actually being shown to the jury.

■ We find that the trial court was correct in ruling that defendant voluntarily absented himself and waived his right to confront the witnesses deposed in his absence. For this reason we need not reach the question regarding the unavailability of the witnesses at the continuation of the trial.[4]

This court is well aware that a criminal defendant has the right under both the Sixth Amendment and the due process clause of the Fourteenth Amendment as well as article I, section 10, of the Rhode Island Constitution "to be present at all stages of his trial where his absence may affect the fairness of the proceedings." *State v. Brown,* 121 R.I. 422, 424, 399 A.2d 1222, 1224 (1979) (citing *Faretta v. California,* 422 U.S. 806, 818–19 & n. 15, 95 S.Ct. 2525, 2532–33 & n. 15, 45 L.Ed.2d 562,

572–73 & n. 15 (1975); *Snyder v. Massachusetts,* 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934); *Trombley v. Langlois,* 91 R.I. 328, 332, 163 A.2d 25, 28 (1960)).

We have also noted that "this constitutional right is primarily for the protection of the accused and is in the nature of a privilege extended to the accused which in a noncapital case he is free to assert or waive as to him may seem advantageous." *Trombley,* 91 R.I. at 332, 163 A.2d at 28. The right to confront a witness face to face "reflects the essential role that the criminal defendant plays in assisting counsel with cross-examination and thus guaranteeing integrity in the factfinding process." *Brown,* 121 R.I. at 424–25, 399 A.2d at 1224.

It is clear, however, that "a defendant's voluntary absence from a trial serves to operate as a waiver of the constitutional right to be present." *State v. Holland,* 430 A.2d 1263, 1267 (R.I.1981); *see also State v. Borges,* 519 A.2d 574, 578 (R.I. 1986).[5] This waiver "must amount to 'an intentional relinquishment or abandonment of a known right or privilege.'" *Brown,* 121 R.I. at 426, 399 A.2d at 1225 (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938)). This court has determined that due process is satisfied if the trial justice makes such inquiry into the circumstances of a defendant's absence as would justify a finding that absence was voluntary. When the defendant is returned to custody and before a sentence is imposed, the trial justice is required to afford him an adequate opportunity to explain his absence. *Borges,* 519 A.2d at 578; *see also Holland,* 430 A.2d at 1268; *Brown,* 121 R.I. at 426–27, 399 A.2d at 1225. "After the trial justice has made an initial finding that the defendant's absence from a proceeding was voluntary, it is incumbent upon the defendant to come forward with evidence to rebut

---

4. The question of unavailability was central to defendant's appeal. This question would only be of consequence if we ruled that defendant did not voluntarily forfeit his right to confront witnesses.

5. In addition, this rule is restated in Rule 43 of the Superior Court Rules of Criminal Procedure: "In prosecutions for offenses not punishable by death, the defendant's voluntary absence after the trial has been commenced in the defendant's presence shall not prevent continuing the trial to and including the return of the verdict."

that finding." *Holland*, 430 A.2d at 1268; *see also Brown*, 121 R.I. at 427, 399 A.2d at 1225.

In the instant case the record demonstrates that the trial court complied with its obligation to inquire into the circumstances of defendant's absence. When the trial justice learned that defendant's counsel had no idea of his whereabouts and defendant had failed to return to his grandmother's house the night before (a condition of his bail), the court concluded that his absence was voluntary. On defendant's return to custody, no evidence was presented to the contrary. Defense counsel stated at trial that defendant was in "a rather awkward position to address that issue" because he had been charged with a new felony under the bail-jumping statute. Since defendant had the burden to come forward with evidence and he chose not to address the issue, the court properly inferred that defendant's absence was voluntary. Furthermore, defendant was afforded an opportunity to view the video tapes before they were presented to the jury. For these reasons it is clear to us that the trial justice carefully complied with the mandates we set forth in *Borges, Brown*, and *Holland*.

We see strong similarities between *Borges* and the case at hand. In *Borges* the defendant was present in court for the commencement of the trial and a pretrial motion. He failed to appear, however, the following day. The prosecution sought some assurance that the defendant would be present the following day. Borges's counsel had spoken to him, and she had been left with the impression that Borges would be in court the next day. When the defendant did not appear as promised, the trial justice issued a warrant for his arrest. Efforts by the Providence and Fall River police to locate him proved fruitless. Even Borges's wife had no idea of her husband's whereabouts. *Borges*, 519 A.2d at 577. When the state announced that it was ready to proceed with trial, the trial justice ruled that Borges's absence was voluntary and adjourned for the day, giving the defendant a final opportunity to be present at the impaneling of the jury. The next day

the defendant failed to appear. The jury was selected, and the trial continued. Evidence was presented relating to guilt, and the jury returned a guilty verdict. Four days later the defendant was arrested. Borges offered no explanation for his absence when given the opportunity to do so, invoking his constitutional protection against self-incrimination. *Id.* at 578.

This court ruled in *Borges* that the defendant had waived his constitutional right to be present by voluntarily absenting himself from trial. *Id.* Since a large part of the trial in the instant case was postponed until defendant had been arrested and defendant was present for most of the presentation of evidence relating to guilt, it appears that Griffin's confrontation rights were largely preserved. Any right he had to confront Doctors Sarlo and Parent face to face was waived by his voluntary absence from court.

## II

The defendant's next assignment of error concerns the trial justice's decision to admit into evidence six photographs of the victim depicting the injuries she suffered at the hands of defendant. Doctor Sarlo testified that he took the photographs in question when he examined the victim and that they represented a fair and accurate portrayal of how Donna appeared when he examined her on September 14, 1984. Doctor Parent also testified that he recognized the injuries and the patient in these photographs. Some photographs depicted the injuries to Donna's face, others depicted the injuries to her lower back, buttocks, legs and thighs, and vaginal area.

The defendant objected to the admittance of some of, or all, these photographs (specifically mentioning three photographs of the vaginal area) into evidence on the grounds that they were inflammatory and gruesome and that their prejudicial effect on the jury outweighed their probative value. We disagree.

This court has ruled repeatedly that the "general rule is that the question of the materiality or relevancy of photographs is

a matter of judicial discretion." *State v. Ware*, 524 A.2d 1110, 1113 (R.I.1987).

Our function is to review the record and to determine whether the trial justice carefully considered whether the probative value of the evidence was outweighed by undue prejudice, "keeping in mind that even if the evidence offered is of a gruesome nature and might tend to influence the jury unduly, it may nevertheless be admissible if it is otherwise material and competent." *Id.* at 1113; *see also State v. Lionberg*, 533 A.2d 1172, 1180 (R.I.1987).

■ The record before us is clear in supporting our ruling that the trial justice's decision to admit the photographs was correct. The trial justice stated:

"I have seen the photographs. You know, they are prejudicial, obviously; however, I think the probative value outweighs the prejudice. There has been testimony as to the nature and extent of the injuries and it is incumbent upon the State to show, in one of the counts, to prove force and coercion. It goes to the very heart of the case. They are not pretty to' look at[,] however, it is the function of the jury to assess that evidence. I will, therefore, overrule the objection."

The pictures are probative of an element of first-degree sexual assault, namely, force and coercion (*see* G.L.1956 (1981 Reenactment) § 11–37–2(C), as amended by P.L.1984, ch. 355, § 1), and they depict the brutality of the beating the victim underwent at the hands of defendant, thereby calling defendant's credibility into question. Thus, the photographs were competent, relevant evidence, and the trial justice did not commit reversible error in admitting them into evidence.

### III

■ The defendant's last assignment of error concerns the trial justice's decision to exclude the result of a blood-alcohol analysis of the victim's blood on the night of the assault. In particular, defendant challenges the trial justice's ruling to sustain the state's objection to certain questions defense counsel asked on cross-examination of Dr. Parent regarding the victim's blood-alcohol level. Doctor Parent admitted that a blood-alcohol-content test was performed, but when defense counsel asked what the result was and whether it was positive, the court sustained the prosecution's objection. Griffin's attorney next asked whether the admitting nurse had noticed alcohol on the complainant's breath, and objection was also made to this question. The objection was sustained, but when defendant's counsel asked the doctor himself if he noticed alcohol on Donna's breath in his conversation with her, the witness was allowed to answer (but he could not recall).

The defendant argues that a high level of alcohol in the complainant's blood is highly probative on the question of the complainant's ability to perceive and recall. Furthermore, he argues, it is important impeaching evidence because the complainant had denied being intoxicated at the time of the incident.

Generally, evidence that a witness was intoxicated at the time of the occurrence of the event about which she or he is testifying is held to be admissible for the purpose of attacking the credibility of the witness. *O'Brien v. Waterman*, 91 R.I. 374, 381, 163 A.2d 31, 35 (1960). The same evidentiary practice is followed regarding the witness's use of drugs at the time of the event to which she or he is testifying. *See State v. Kelly*, 554 A.2d 632, 637 (R.I.1989); *State v. Carrera*, 528 A.2d 331, 333 (R.I. 1987).

Although the trial court did not allow evidence regarding the victim's blood-alcohol level, it did allow defense counsel to cross-examine Donna extensively on whether she had taken any drugs or had any drinks that day. Donna admitted that she had taken Valium during the day. She also admitted to being under the influence of alcohol but not drunk when the assault occurred. Furthermore, after extensive arguments from both the prosecution and the defense, the court ruled that the witness's use of substances was "certainly proper material for cross-examination" and that her medical record regarding this issue was

admissible evidence. Subsequently Donna informed defense counsel that when she was readmitted to Rhode Island Hospital in October 1984 she told the treating personnel that she had a two- to five-year history of binge drinking and that blackouts were common.

We are certain that despite the fact that Dr. Parent was not permitted to testify regarding Donna's blood-alcohol content in terms of numbers, there was sufficient evidence before the jury regarding her level of intoxication. If defendant had wanted the jury to know the results of the blood-alcohol-content test, defendant could have presented such evidence by introducing the medical record into evidence in accordance with G.L.1956 (1985 Reenactment) § 9-19-27. We find that there was sufficient evidence for the jury to make a realistic determination of Donna's ability to perceive the events that took place on September 14, 1984.

For these reasons we uphold the trial court's decision to exclude the doctor's testimony regarding the result of the blood-alcohol-content test. Its exclusion did not result in any prejudice to the defendant. Moreover, exclusion of the blood-alcohol content of Donna's blood is not probative regarding the issue of the defendant's guilt. It is clear that there was ample evidence before the jury regarding the sexual-assault and robbery charges. The fact that the victim was under the influence of alcohol does not in any way diminish the defendant's guilt.

For the reasons stated, the defendant's appeal is denied and dismissed. We affirm the judgment of conviction and remand the case to the Superior Court.