Suanne SHAYER et al.

v.

Conor K. BOHAN et al.

No. 96–9–Appeal.

Supreme Court of Rhode Island.

Feb. 13, 1998.

Raymond A. Lafazia, Edward P. Sowa, Providence, for Plaintiff.

Faith A. LaSalle, Donna M. Lamontagne, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

WEISBERGER, Chief Justice.

This case comes before us on appeal from a Superior Court judgment entered in favor of the plaintiff Suanne Shayer (Suanne) in an allegedly insufficient amount. The plaintiffs contend that the trial justice erred in denying Suanne's motion for a new trial or an additur. They also argue that the trial justice erred in directing verdicts against the minor plaintiffs' claims for loss of society, substituting the defendant driver in the place of an insurance carrier, and admitting evidence of Suanne's intoxication. For the reasons discussed below, we affirm the judgment of the Superior Court. The facts insofar as relevant to the instant appeal are as follows.

On or about March 8, 1989, Suanne was involved in an automobile accident in Newport, Rhode Island, with defendant Conor K. Bohan (Bohan or driver). Suanne, a registered nurse, was driving back from a work-related appointment and was traveling approximately twenty-five miles per hour when her vehicle stalled and was rear-ended by a vehicle driven by Bohan. The police were not called to the scene, and after the accident Suanne told Bohan that she was "okay." She did not tell him that she struck any part of her body.

On March 10, 1989, Suanne sought treatment at an emergency medical walk-in center complaining of neck, shoulder, and back pain. She was diagnosed with a cervical strain. Despite her current complaint Suanne claims that because she was not asked, she never told anyone at the center that she had hit her head. Thereafter, she filed a workers' compensation claim and received benefits for some time. Evidence concerning these benefits was submitted to the jury without objection.

On September 19, 1989, Suanne consulted Taranath Shetty, M.D. (Dr. Shetty), complaining of dizzy spells and headaches. She told Dr. Shetty that she sustained injuries to her entire upper body in the 1989 accident. Doctor Shetty performed an electroencephalogram (EEG) that revealed minor abnormalities in the midtemporal region. He suggested the abnormalities could be related to her recent head trauma.

On December 21, 1989, Suanne sought treatment from Medhat A. Kader, M.D. (Dr. Kader), complaining of head, neck, and low-back pain. She told Dr. Kader that she had not been wearing a seatbelt at the time of the 1989 accident and that "her body was thrust forwards, backwards and sideways, and her head hit the door." Upon physical examination and review of Suanne's medical history from several other health-care providers, Dr. Kader concluded that there was no evidence from clinical examination or from diagnostic tests of any organic pathology to substantiate Suanne's continuation of symptoms. He advised her that she was not disabled and was capable of returning to full-time work with no restrictions.

On June 4, 1990, Suanne was involved in a second automobile accident while a passenger in a vehicle operated by her fiancee, Steven Maggiacomo (Maggiacomo). On June 6, 1990, Suanne was examined by a neurosurgeon, Julius Stoll, Jr., M.D. (Dr. Stoll), for purposes of her workers' compensation claim and for treatment of "episodes or spells" she claimed to have resulted from the 1989 accident. The spells consisted of Suanne's becoming argumentative and irritable, having a glazed look in her eyes, being unable to stand

or to comprehend, thinking and speaking slowly, slurring her speech, and acting like a "drunken sailor." Suanne did not inform Dr. Stoll of her June 4, 1990 accident, nor is there any indication that she informed him about having struck her head in the 1989 accident. She did, however, tell him she had been traveling forty-five miles per hour when the 1989 accident occurred. On direct examination Dr. Stoll testified that based on the information he had at the time, his determination was that Suanne more than likely had temporal-lobe seizures that were causally related to the 1989 accident. On cross-examination Dr. Stoll testified that he did not diagnose Suanne as suffering from temporal-lobe seizures, rather he recommended further study.

By December 1994 Suanne was in treatment with neurologist William Stone, M.D. (Dr. Stone). On December 28, 1994, she was admitted to Miriam Hospital while experiencing one of her typical spells as described above. She was taken to the hospital by Maggiacomo for an EEG at the direction of Dr. Stone. Norman M. Gordon, M.D. (Dr. Gordon), a neurologist in practice with Dr. Stone, was covering for him at the time of her admission.

Maggiacomo told Dr. Gordon that Suanne was in a normal mental state when Maggiacomo left the morning of the twenty-eighth. When he returned, however, she and her environment were in a state of disarray. The Christmas tree had been knocked over, she had tinsel in her hair, and abrasions on her face, and she was confused. Maggiacomo stated that this was typical of one of her episodes and that although Suanne denied consuming alcohol, he frequently smelled alcohol on her.

Upon physical examination it was noted that Suanne exhibited a symptom known as nystagmus or wiggly eyeball—symptomatology frequently related to significant alcohol consumption. Diagnostic tests performed on admission, including an EEG and a blood-alcohol-level test, revealed that Suanne's spell was caused by significant alcohol consumption.

Initially the results of the blood-alcohol test were received over the telephone and recorded in Suanne's hospital records as .132 percent. The following day Smith Kline Beecham Laboratories forwarded an official written report of Suanne's blood-alcohol test. The written report reflected a blood-alcohol content (BAC) of .312 percent. Although Suanne specifically denied using alcohol, a second EEG performed the next morning was quite within normal limits, revealing that Suanne had no brain abnormality. Doctor Gordon discharged Suanne, informing her that her episode was either wholly or at least mostly related to consumption of a large amount of alcohol.

## Travel of the Case

On December 9, 1991, Suanne filed a complaint naming the driver and his father, the owner of the automobile, J.S. Bohan (owner), as defendants. On December 13, 1991, attempted service of process upon the driver was returned *non est inventus* with a notation from the deputy sheriff that read, "[Defendant] out of USA in France Back in April 1992." On February 25, 1992, plaintiffs amended their complaint, filing a direct action against the owner's insurance carrier, USAA Property and Casualty Company (USAA), pursuant to G.L.1956 § 27–7–2. On April 29, 1992, the deputy sheriff spoke to the driver's mother, who informed him that her son resided in Providence and attended Brown University. On August 13, 1992, a deputy sheriff served the owner in person at Newport Hospital. On February 3, 1995, USAA moved for summary judgment, requesting the court to remove the insurance company name from the pleadings. The motion was denied on April 26, 1995. On May 2, 1995, defense counsel moved to substitute defendant driver in the place of USAA pursuant to Rule 25(c) of the Superior Court Rules of Civil Procedure. Substitution was granted and the case proceeded. After conducting an evidentiary hearing outside the presence of the jury, the trial justice determined that evidence of Suanne's alcohol consumption, including the Smith Kline laboratory report, would be admissible. On May 9, 1995, the trial justice granted a motion for directed verdicts against the minor plaintiffs. On May 11, 1995, the jury returned a verdict

in favor of plaintiff Suanne, awarding her $33,406.05 plus interest. The plaintiffs filed a timely motion for a new trial and additur, which was denied on July 18, 1995.

The issues raised by plaintiffs will be dealt with in the order in which they are raised in plaintiffs' brief. Any additional facts necessary to the resolution of the issues will be discussed in the rest of this opinion.

I

Evidentiary Rulings on the Issue of Suanne Shayer's Blood Alcohol Content

Suanne asserts that the trial justice's admission of the Miriam Hospital records, including the Smith Kline laboratory report wherein her BAC was recorded as .312 percent, was in violation of Rules 403 and 803(6) of the Rhode Island Rules of Evidence because they were prejudicial and untrustworthy. Moreover Suanne argues that because no evidentiary hearing was held to establish the chain of custody of the blood sample or to establish which BAC results were correct— the .312 percent or .132 percent (which was received over the telephone and recorded in Suanne's medical records during her 1994 hospitalization)—admission of the Miriam Hospital records was erroneous. She specifically asserts that admission of this evidence was in violation of this court's ruling in *Handy v. Geary*, 105 R.I. 419, 252 A.2d 435 (1969). We disagree.

In *Handy*, we established a procedure for a trial justice to follow whenever the issue of intoxication is raised:

"[B]efore evidence of drinking of intoxicants may be presented to the jury, the trial justice shall conduct a preliminary evidentiary hearing * * * in the absence of the jury. If he [or she] finds that the evidence is such that different minds can naturally and fairly come to different conclusions on the question of intoxication * * * only then, may evidence of drinking be admitted" and the question be determined by the jury. 105 R.I. at 431, 252 A.2d at 441–42.

Contrary to plaintiffs' assertion, the trial justice did conduct an evidentiary hearing consistent with our ruling in *Handy*. De-

fense counsel was not permitted to present any evidence related to alcohol in her opening statement or to cross-examine Suanne on the issue of alcohol consumption when she initially took the stand. However, testimony by Suanne's daughters, in the presence of the jury, pointed to the possibility of alcohol consumption as an alternative cause for Suanne's spells. Specifically they testified that they observed their mother falling down, getting wobbly, slurring her speech, and exhibiting incoherent behavior but never to an extent that she did not know where she was or what she was doing. At this juncture the trial justice conducted a *Handy* hearing in the absence of the jury wherein Suanne testified that while under a spell it is possible that she has consumed alcohol.

The evidentiary hearing focused on Suanne's spells and whether there was any evidence linking them to alcohol consumption. We conclude that it is clear from the record that the trial justice carefully considered whether the probative value of Suanne's alcohol consumption was outweighed by prejudice. *See State v. Griffin*, 567 A.2d 796, 801 (R.I.1989). In *Griffin* we discussed the role of the appellate court in conducting a Rule 403 balancing analysis:

"Our function is to review the record and to determine whether the trial justice carefully considered whether the probative value of the evidence was outweighed by undue prejudice, 'keeping in mind that even if the evidence offered is of a gruesome nature and might tend to influence the jury unduly, it may nevertheless be admissible if it is otherwise material and competent.'" 567 A.2d at 801 (quoting *State v. Ware*, 524 A.2d 1110, 1113 (R.I. 1987)); *see also State v. Smith*, 602 A.2d 931, 936 (R.I.1992).

While testifying, Suanne did not deny or contradict the medical history given to her physicians by Maggiacomo, who regularly accompanied her to medical appointments. He described her appearance and behavior while undergoing a spell as *inter alia* that of a "drunken sailor"—glazed look, extremely argumentative, and unable to stand, comprehend, or concentrate. Suanne stated that

after having been informed by a physician that her 1994 spell and hospitalization were the result of alcohol consumption, she decided to purchase a large box that could be locked in which to store Maggiacomo's liquor supply. The trial justice and Suanne had the following exchange:

"The Court: Tell me about this lock box with alcohol.

"The witness [Suanne]: Yes. Went to the drug store. The kind guys put on the back of their trucks, put their tools in. Big. wide. Cost me three hundred dollars. I bought it for Steven to put all the liquor in there. And, it has two keys. He has them. He keeps them.

" * * *

"The Court: You only drank, according to your testimony, occasionally?

"[Suanne]: That is right.

"The Court: You felt obliged to have a need for a lock box so the liquor could be locked up so you couldn't get to it?

"[Suanne]: Well, I felt that the situation—not being able to remember having drank necessitated drastic assurance that that not happen again.

"The Court: So, you don't recall whether you did drink, or didn't drink?

"[Suanne]: That is correct.

"The Court: You might well have consumed a fair amount of alcohol before getting to a point where you were required to be taken to Miriam Hospital?

"[Suanne]: Might have been * * *. I wanted to be sure it never happened again * * *.

"The Court: All of these other episodes, as far as you know, maybe have a similar situation where you ingested a fair amount of alcohol, didn't even know about it?

"[Suanne]: Well, we have talked about that a lot within the family.

"The Court: You felt a need to get a strong box to avoid you unconsciously, without thinking, without knowing, getting into a bottle of liquor?

"[Suanne]: What Dr. Gordon said to me was that it was very possible that I was having an episode, seizure, or whatever these spells are, and in that unconscious-ness [sic] episode the intake [consumption of alcohol] happened."

In determining whether to allow any evidence of intoxication to be heard by the jury, the trial justice specifically considered whether different minds can naturally and fairly come to different conclusions on the question of intoxication:

"The Court: Well, there isn't much question some symptoms are classic intoxication symptoms. Slurred speech, the inability to walk, wobble when she walks, glazed look * * *. Some of these things are classic intoxication signals.

"[Plaintiffs' Counsel]: Also classic for other things.

"The Court: Well that may well be. But does defense counsel have a right to show that this is also classic intoxication as well as what you claim it is?

"[Plaintiffs' Counsel]: If [defense counsel is] going all the way and bring in experts or anybody to say it was yes, but if she is not, no.

" * * *

"The Court: Well, I think there's something to be said about [defense counsel's] argument * * *. If [Suanne] had the admission to the hospital December of '94 symptoms being as they are described, characterized as one of her 'episodes' that were typical of her problem the last few years, in fact it turns out that this episode is * * * [the result of alcohol intoxication] then I think the finders of fact ought to know that, because they may well conclude that based on the symptoms described in December of '94 which are typical of the ones that were described on prior occasions which she claims resulted from an accident in 1989 may well be not the accident that caused it, but something else."

The trial justice went on to say, however, that evidence of intoxication would not be admitted without "some sort of expert testimony," and indeed, two experts, Doctors Norman M. Gordon and Mary E. McNamara (Dr. McNamara) testified at trial. Doctor Gordon, relying on Suanne's nystagmus or wiggly eyeball present during the 1994 hospitalization, the results of her EEG and the

.132 percent blood-alcohol test, as well as her past medical history provided by Maggiacomo, concluded that Suanne's spells were due to intoxication. Doctor McNamara, relying on that same medical data as well as the .312 percent blood-alcohol-test result, also concluded that Suanne's spells were due to intoxication.

■ On the entire record we conclude that the trial justice had substantial evidence of intoxication introduced before the expert testimony was presented before the jury. It was obvious that defense counsel had produced and would produce substantial evidence to show that Suanne was intoxicated when she was brought to Miriam Hospital. Consequently the requirements of *Handy* were adequately met in this case.

Further, since Doctors Gordon and McNamara relied upon the Miriam Hospital records in forming their conclusions, plaintiffs' contention that the hospital records were untrustworthy and inadmissible is without merit. The records were admissible under Rule 703 of the Rhode Island Rules of Evidence, which provides for the opinion testimony of experts relying upon facts or data derived from numerous sources:

> "If of a type reasonably and customarily relied upon by experts in the particular field in forming opinions upon the subject."[1]

■ The plaintiffs' next contention that an evidentiary hearing was required regarding which report reflected the correct BAC because the chain of custody of the blood sample was never established, is also without merit. Rule 703 provides that the "underlying facts or data shall be admissible without testimony from the primary source," and the trial justice correctly determined that chain-of-custody issues go to the weight of the evidence, not its admissibility. *State v. Cohen,* 538 A.2d 151, 154 (R.I.1988); *see also State v. Gara,* 644 A.2d 312, 312 (R.I.1994) (Mem.).

## II

### Directed Verdict Against Minor Plaintiffs

The plaintiffs argue that the directed verdicts against Suanne's two minor daughters on their loss-of-society claims were erroneous because they enjoyed a good relationship and that prior to the 1989 accident they visited with one another on the weekends and regularly went on hiking trips.

When presented with a motion for directed verdict, the trial justice, and this court on review, should consider the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and all reasonable inferences should be drawn to support the position of the nonmoving party. *Morrocco v. Piccardi,* 674 A.2d 380, 382 (R.I. 1996) (citing *Powers v. Carvalho,* 117 R.I. 519, 524, 368 A.2d 1242, 1246 (1977)). If after such a review factual issues remain upon which reasonable minds might differ, the issues must be submitted to the jury for determination. *Id.* at 382. However, "[a] verdict should be directed when the evidence permits only one legitimate conclusion in regard to the outcome." *Long v. Atlantic PBS, Inc.,* 681 A.2d 249, 252 (R.I.1996).

General Laws 1956 § 9-1-41(b) provides for recovery for loss of society and companionship for a minor child if he or she can show a "loss of parental society and companionship caused by tortious injury to his or her parent." Upon review of the record we find no error in the trial justice's decision to grant directed verdicts. The daughters testified that they had not lived with their mother since 1988. One daughter testified that she was upset over her mother's spells and that she visited with her approximately six times per month—"give or take." Both daughters testified that she had not been aware of Suanne's 1994 hospitalization.

■ The only reasonable conclusion that could be derived from the evidence presented

---

**1.** The Advisory Committee's Notes to Rule 703 of the Federal Rules of Evidence provide that an expert's opinion may be based on reports and information from "numerous sources and of considerable variety, including statements by pa-tients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays." *See also State v. Fogarty,* 433 A.2d 972, 977 (R.I.1981).

is that the relationship between Suanne and her children was minimal at best even prior to the accident. There was no competent evidence to show that the accident resulted in a loss of society between Suanne and her children. We concur with the trial justice in finding that the children were separated from their mother as a result of divorce, not as a result of the 1989 accident.

## III

### Substitution of Driver in the Place of USAA

The plaintiffs argue that the "law of the case" doctrine precluded the trial judge from substituting the driver in place of USAA because an earlier request to remove USAA from the pleadings had been denied by the motion justice.

In *Payne v. Superior Court,* 78 R.I. 177, 184, 80 A.2d 159, 163 (1951), this court held that "[w]here a pure question of law is involved, ordinarily the second justice should not, if the same question is presented to him in the same manner, review the action of the first justice. * * * It is the first justice's action that is the law of the case and that should not be disturbed." This rule was not violated by the trial justice because, unlike the motion justice who denied USAA's summary judgment motion to be removed from the pleadings pursuant to Rule 56 of the Superior Court Rules of Civil Procedure, the trial justice granted USAA's motion to substitute parties pursuant to Rule 25(c).

The plaintiffs further asserted during oral argument, that since service of process on the driver was returned *non est inventus,* and USAA had been served pursuant to § 27–7–2, the substitution of the driver for USAA when the case was reached for trial was precluded by this court's ruling in *Maczuga v. American Universal Insurance Co.,* 92 R.I. 76, 79–81, 166 A.2d 227, 229–30 (1960). Again we disagree.

We held in *Maczuga* that when a writ of summons against an insured motorist was returned *non est inventus* and a direct action against insurer resulted, the knowledge of an insured's whereabouts acquired subsequent to commencement of an action is no ground

for dismissal of the cause of action against an insurer, at least in the absence of a showing that attempts to obtain service on an insured in the first instance were not made in good faith. *Id.* at 81, 166 A.2d at 230.

Section 27–7–2 provides for a direct liability action against an insurer when service of process on a defendant insured is returned *non est inventus,* that is, when service on a defendant insured is attempted in good faith but cannot be effectuated. The notion of a good-faith attempt to serve "presupposes a reasonably diligent effort to obtain service on the insured such as would be made if no question of insurance were involved." *Goodman v. Turner,* 512 A.2d 861, 865 (R.I.1986) (quoting *Collier v. The Travelers Insurance Co.,* 97 R.I. 315, 321, 197 A.2d 493, 496 (1964)). The statute is designed only to provide a remedy to the injured party when service against the insured cannot be obtained. *Barber v. Canela,* 570 A.2d 670, 671 (R.I.1990).

The instant case is distinguishable from *Maczuga* because service upon the insured owner was effectuated, making the insurance proceeds available as a source of recovery for plaintiffs. Therefore, the purpose of the statute, that is, to ensure recovery from an unavailable defendant was not applicable to this set of facts, and the trial justice's decision to substitute the driver merely added to a remedy that was already adequate. Moreover, substituting the driver served to prevent prejudice to the owner. With USAA as a named party the jury may have been misled into believing that the insurance carrier would be able to pay any judgment rendered for plaintiff. However, although § 27–7–2 allows direct action against an insurer, it does "not enlarge the liability of the insurer beyond the limits stated in the policy." *Barber,* 570 A.2d at 671.

We concede that the rationale expressed by the court in *Gnys v. Amica Mutual Insurance Co.,* 121 R.I. 131, 134–35, 396 A.2d 107, 109 (1979), is not consistent with our opinion in this case. Upon reflection we are no longer persuaded by the rationale of *Gnys,* and consequently, insofar as that reasoning is inconsistent with our present opin-

ion, the holding in *Gnys* is no longer controlling.

We conclude that in the circumstances of this case the substitution of the driver as a party defendant for the insurance company resulted in no perceptible prejudice to plaintiffs and avoided possible prejudice to defendant owner.

## IV

### Denial of Plaintiff's Motion for New Trial or Additur

Suanne argues that the jury award of $33,-406.05, plus interest, did not include full compensation for pain and suffering, even if the award was restricted to the period of orthopedic disability—March 7, 1989, to on or about December 28, 1989. She specifically asserted during oral argument that she had not been fully compensated for her headaches. Additionally she argues that the jury was influenced by prejudice because of the admission of the Miriam Hospital records, including her laboratory report reflecting a .312 percent BAC before a determination of the report's trustworthiness, particularly since defendants' experts relied on the hospital record. The plaintiff's arguments are without merit.

We have held that "a damage award may be disregarded by the trial justice and a new trial granted only if the award shocks the conscience or indicates that the jury was influenced by passion or prejudice or if the award demonstrates that the jury proceeded from a clearly erroneous basis in assessing the fair amount of compensation to which a party is entitled." *Hayhurst v. LaFlamme*, 441 A.2d 544, 547 (R.I.1982); *Bruno v. Caianiello*, 121 R.I. 913, 917, 404 A.2d 62, 65 (1979). We do not believe Suanne's award would come within the rule enunciated by those cases. It neither shocks the conscience, nor is it shockingly disparate from her proven damages.

The reports of Doctors Kader and Stanley Stutz indicated that by December of 1989 Suanne was no longer disabled and was able to return to full-time work with no restrictions. The period of disability of ap-

proximately nine months with its concomitant claims, loss of compensation and pain and suffering, was addressed by the jury in its award of damages. We cannot fault the trial justice in his determination that the verdict responded to the evidence of special damages and medical expenses proven at trial. Although the award may not have been generous, we cannot say that the trial justice was clearly wrong in finding it to have been adequate.

For the foregoing reasons the plaintiffs' appeal is denied, and the judgment of the Superior Court is affirmed.