DECISION
Before the Court is defendants' motion for a new trial, pursuant to Rule 59 of the Rhode Island Superior Court Rules of Civil Procedure.
This matter arose out of a motor vehicle accident that occurred on November 5, 1985. The plaintiff, Joseph Neves (Neves), was operating a truck leased from defendants U-Haul Rentals, U-Haul Company of Rhode Island, and Rentals Unlimited, Inc. (collectively, U-Haul). While Neves was proceeding along Atwood Avenue in Johnston, Rhode Island, the truck's steering mechanism allegedly failed. The truck struck several vehicles that were parked along the right curbside. At the time of the accident, Neves was accompanied by an acquaintance, Malcolm Reis, Jr.[1]
Neves claimed injuries resulting from the collision.
Neves asserted that U-Haul's negligent maintenance of the subject truck rendered it unsafe, thereby making it foreseeable that a motor vehicle accident was likely to occur, and specifically that Neves's injuries were caused thereby. The jury determined that the defendants were negligent, and that such negligence was a proximate cause of Neves's injuries. The jury awarded damages in the amount of $400,000. Judgment for Neves, plus interest and costs, was entered forthwith. U-Haul, thereafter, filed the instant motion to which the plaintiff objected. In moving for a new trial, U-Haul argues that the jury verdict on liability is against the law, the preponderance of the evidence, and fails to administer substantial justice between the parties. U-Haul also contends that the damage award of $400,000 results from juror passion because it is so excessive in relation to the injuries claimed by Neves. Neves counters that the jury verdict, as to liability and damages, was reasonably based on the evidence and that the verdict was just.
 Motion for a New Trial
"In deciding a motion for a new trial, a trial justice sits as the super juror and is required to independently weigh, evaluate and assess the credibility of the trial witnesses and evidence. If the trial justice determines that the evidence is evenly balanced or is such that reasonable minds, in considering the same evidence, could come to different conclusions, then the trial justice should allow the verdict to stand." Morrocco v. Piccardi, 713 A.2d 250, 253 (R.I. 1998) (citing Barbato v. Epstein, 97 R.I. 191, 193-94, 196 A.2d 836, 837 (1964)). "If, however, the trial justice finds that the jury's verdict is against the fair preponderance of the evidence, he or she must grant the motion for a new trial." Reccko v. Criss Cadillac Co., Inc., 610 A.2d 542, 545 (R.I. 1992) (citing Sarkisian v. NewPaper, Inc., 512 A.2d 831, 836 (R.I. 1986)). "Although the trial justice need not perform an exhaustive analysis of the evidence, he or she should refer with some specificity to the facts which prompted him or her to make the decision so that the reviewing court can determine whether error was committed." Id. (citing Zarrella v. Robinson, 460 A.2d 415, 418 (R.I. 1983)).
U-Haul argues that the jury's finding of proximate cause is against the fair preponderance of the evidence. Specifically, U- Haul contends that the testimony provided by the plaintiff regarding causation failed to meet its burden of proof, that it is more likely than not that, but for the defendants' negligence, the plaintiff's injuries would not have occurred. Based on the testimony of the parties' experts as to causation, it is undisputed, U-Haul contends, that the truck's steering linkage would not have come apart under normal circumstances, and the linkage would have separated spontaneously before the collision only if U-Haul had inadequately maintained the truck. As to causation, U-Haul relies on the opinion testimony of its expert, engineer John Zamparo, that the truck had been rented in good condition.
Neves testified that after leasing the truck in the afternoon on November 5, 1985, he had driven it to several stops, including a stop at his daughter's apartment. He further testified that while he was driving along the center of the southbound right- hand lane on Atwood Avenue in Johnston at approximately 25 to 35 miles per hour, the truck became uncontrollable. He testified that, at a right bend in the road, the steering wheel suddenly pulled to the right as if something in the front end broke. Neves's testimony was that although he applied the brakes, the truck continued to swerve to the right and collided with three vehicles, a motorcycle and two automobiles, which were parked in a row at the right-hand curb. Neves testified that the truck then came to a stop.
As to the cause of the failure of the truck's steering mechanism, U-Haul first challenges the methodology of plaintiff's expert, mechanic Jeffrey Garfinkle. Mr. Garfinkle testified that, in addition to his experience and training, he based his opinion on review of Neves's deposition, defense expert's answers to interrogatories, and photographs of relevant parts of the subject truck, as well as study of a repair manual, and ownership and maintenance of a similar model truck. In contrast, for example, defense expert, engineer John Zamparo examined the subject truck and, additionally, was a passenger while it was driven with the subject tie rod disconnected. Despite the contrasting approaches of the experts in analyzing the failure of the steering mechanism, this Court is satisfied that Mr. Garfinkle's opinion is based on a sufficient methodology and ample evidence. See generally, Owens v. Payless Cashways, Inc.,670 A.2d 1240 (R.I. 1996).
To establish causation, Neves relies on Mr. Garfinkle's testimony which included several examples of U-Haul's faulty maintenance of the subject vehicle. Specifically, he testified that excessive and inappropriate play in the steering mechanism could have loosened the nut connecting the relevant components of the steering linkage; namely, the tie rod with the center link. Such play, the expert testified, was evidenced by certain markings on the component parts. He further testified that said defects could be discovered upon maintenance inspection. Additionally, Mr. Garfinkle testified that a portion of the tie rod had been installed improperly. Mr. Garfinkle testified that the truck, with its disconnected steering assembly, could not be adequately controlled, and the subject collision could have resulted thereby. U-Haul contends that said testimony was undermined by inconsistencies during cross examination and that its expert's opinion was more credible.
The fact that the testimony of the parties' experts is conflicting as to causation does not render the verdict contrary to the evidence or indicate the jury overlooked material evidence. Further, inconsistencies, if any, in a witness's statement do not preclude a factfinder from accepting the testimony as credible. See Madeira v. Pawtucket Housing Authority, 105 R.I. 511, 515, 253 A.2d 237, 239 (1969). "Since credibility is purely a factual issue, the trier of fact can pick and choose from the witness's entire testimony that portion which he [or she] finds worthy of belief or reject all of his [or her] testimony as incredible." Id. (citation omitted). In other words, it is within the factfinder's discretion to accept some, all, or none of the testimony in reaching its conclusion as to causation. "It is well-settled that where the testimony of two witnesses is conflicting and the trier of fact expressly accepts the testimony of one of the witnesses, he [or she] implicitly rejects that of the other." Turgeon v. Davis, 120 R.I. 586, 592,388 A.2d 1172, 1175 (1978).
After careful consideration of the evidence, this Court finds that there is sufficient evidence upon which reasonable minds could differ, and is satisfied that the jury verdict is not against the law or the fair preponderance of the evidence and does not fail to administer substantial justice between the parties. Accordingly, U-Haul's motion for a new trial with respect to liability is denied. Excessiveness of Damages
U-Haul argues that a new trial is warranted because the jury's award of damages in the "extremely excessive" amount of $400,000 must have been motivated by jury passion rather than pursuant to the evidence on damages. Said passion may be based, U-Haul contends, on Neves's testimony regarding his impoverished condition, or perhaps on an incorrect assumption by the jury that this case took fourteen years to reach trial because of something that U-Haul did.[2] Neves counters that, aside from Neves's neck, shoulder and leg injuries, specials of approximately $15,000, and bilateral wrist surgery, the jury could have accepted a reasoned per diem argument regarding Neves's pain and suffering related to his wrists.
"[A] damage award may be disregarded by the trial justice and a new trial granted only if the award shocks the conscience or indicates that the jury was influenced by passion or prejudice or if the award demonstrates that the jury proceeded from a clearly erroneous basis in assessing the fair amount of compensation to which a party is entitled." Shayer v. Bohan, 708 A.2d 158, 165 (R.I. 1998) (citations omitted). In other words, "`the fixing of damages, while initially a jury's responsibility, may be interfered with by a trial justice on a motion for a new trial if, in the exercise of his [or her] independent judgment in passing upon the evidence adduced with respect thereto, he [or she] finds that the award is grossly in excess of an amount adequate to compensate for the injuries sustained.'" Gordon v. St. Joseph's Hospital, 496 A.2d 132, 138 (R.I. 1985) (quoting Wood v. Paolino, 112 R.I. 753, 755, 312 A.2d 744, 745 (1974)). "[A] trial justice, in reducing a verdict or conditioning the denial of a motion for a new trial on a plaintiff's assent to a reduction in the amount of damages awarded, should reasonably indicate with particularity that portion of the jury's award that is excessive and warrants a remission of excess." Tomaino v. Concord Oil of Newport, Inc., 709 A.2d 1016, 1026, (R.I. 1998) (citing Devine v. United Electric Railways Co., 85 R.I. 170, 172- 73, 128 A.2d 334, 335 (1957)).
Plaintiff testified that the collision caused neck, shoulder, leg and bilateral wrist injuries. In support of plaintiff's testimony regarding his injuries, the uncontroverted medical evidence, by way of reports and records, consisted primarily of the deposition testimony, with exhibits attached, of orthopedic surgeon Leonard Hubbard, MD. Dr. Hubbard testified that he had no independent recollection of the treatment apart from what was documented in his office file. Dr. Hubbard testified that he treated Neves for collision-related injuries from November 1985 through August 1986, and, also, that he reevaluated Neves in July 1998. He further testified that Neves presented with complaints involving neck, shoulder, headaches and visual changes from November 27, 1985 to February 4, 1986 and wrist complaints beginning on February 24, 1986. Dr. Hubbard testified that he completed the July 1998 reevaluation because this case was approaching trial.
According to the evidence, the first segment of the treatment course consisted of office visits on November 27, 1985, January 6, 1986, and February 4, 1986. At the initial visit, Dr. Hubbard noted Neves's complaints of neck and shoulder pain; he diagnosed cervical strain and shoulder contusion. Dr. Hubbard referred Neves to a neurologist for complaints of headaches and visual changes. A November 6, 1985 report, describing electromyographic testing (EMG), indicated bilateral carpal tunnel syndrome. On January 6, 1986, Dr. Hubbard noted that Neves complained of shoulder pain, headaches and visual changes; again, he referred Neves for neurological consult. Dr. Hubbard testified that nothing in the first or second office visit notes indicated that Neves was unable to perform his occupational duties. He referenced a January 9, 1986 public assistance form indicating restrictions in bending, standing, sitting, lifting and climbing due to Neves's cervical strain, headaches, visual changes and shoulder contusion.
According to Dr. Hubbard's testimony, the February 4, 1986 office visit focused on whether or not Neves's cervical injury prevented him from returning to work. On February 4, 1986, Dr. Hubbard noted that Neves was doing extremely well and would attempt to return to work part-time. He also noted that "[a] repeat EMG done on January 14, 1986 demonstrates he still has carpal tunnel syndrome, although the patient states his carpal tunnel symptoms have nearly disappeared." Dr. Hubbard testified that Neves did not require treatment for the neck or shoulder on or after February 4, 1986. He also testified that there is no neurological consult in the record regarding the complaints of headaches and visual changes; an evaluation for visual changes showed that Neves was basically without pathology. Dr. Hubbard further testified that Neves was incapacitated from November 27, 1985 through February 4, 1986 due to the neck, shoulder, headaches and visual changes.
The remainder of Neves' 1986 appointments with Dr. Hubbard involved the wrist or carpal tunnel condition. On February 24, Dr. Hubbard noted only rare numbness and tingling for which, at that time, Neves did not want to pursue treatment. He would be seen as needed. On March 26, Neves reported his symptoms were worse and subsequently underwent carpal tunnel releases, on May 23, 1986 and July 10, 1986. There were subsequent reevaluations on May 29, 1986, June 16, 1986, July 15, 1986, July 23, 1986 and August 20, 1986, and a referral for hand therapy. Dr. Hubbard testified that Neves was disabled due to his wrist condition from March 26, 1986 through August 20, 1986.
Dr. Hubbard's pretrial evaluation on July 13, 1998 indicates that Neves had "some occasional symptoms of aching in the hands and he states he drops things. However, he does not have any numbness or tingling." Dr. Hubbard testified that Neves had gone on to do well. On July 13, the doctor noted two well-healed one- and-one-half inch incisions, full motion of upper extremities, unremarkable tests, normal sensation and minimal tenderness over the scar. Dr. Hubbard testified that he assigned, according to American Medical Association guidelines, a 5% impairment rating for each upper extremity because of some residual discomfort and loss of dexterity. When asked to discuss the 5% impairment rating for each upper extremity, Dr. Hubbard opined that one cannot take that "to have any direct translation to what a patient can do because 5% for someone who does manual labor may be essentially no disability whereas 5% for a concert pianist would result in the termination of his career. So it has to be interpreted in light of the patient's activities." Dr. Hubbard testified that the 5% impairment is considered a permanent partial disability, meaning Neves may reasonably expect to suffer these symptoms for the rest of his life. According to Dr. Hubbard's testimony, no further treatment is needed.
In summary, the evidence indicates that Neves's neck strain and shoulder bruise resolved by February 4, 1986. The carpal tunnel impingement was diagnosed with electromyography and successfully released surgically. Aside from the diagnostic EMGs, the treatment course for the wrists spanned from February 24, 1986 to August 20, 1986. Since the August 20, 1986 office visit, Neves has not required treatment, and no further treatment is necessary. The July 1998 reevaluation was for pretrial purposes, not because Neves presented with symptomology. At that time, Neves was considered to have, in this Court's opinion, a minimal impairment of each hand due to complaints of occasional discomfort and loss of dexterity.
After careful consideration of the evidence, this Court, finding that the award fails to do substantial justice between the parties because it is excessive in relation to the evidence of injuries sustained by Neves, is satisfied that the jury's award of damages was the result of undue passion or prejudice. This Court further finds that, on the evidence before it, the sum of $165,000 would adequately compensate the plaintiff for damages sustained as a result of defendants' negligence. Accordingly, unless plaintiff remits all of the jury's verdict in excess of $165,000, the Court orders a new trial solely on the issue of damages.
Counsel shall submit a proposed judgment for entry.
[1] Malcolm Reis, Jr. was initially a plaintiff in this matter. However, at the trial calendar call, Mr. Reis's counsel, addressing whether or not the claims of Mr. Reis would go forward, represented that Mr. Reis had relocated out of state. Mr. Reis was not available for trial, and defendants' motion to dismiss the claims of Mr. Reis was granted. Apparently, Mr. Reis was the only eyewitness to the collision.
[2] The Court, noting that plaintiff during opening statement assumed responsibility for any delay in coming to trial, is not persuaded by this contention.