DECISION
Before this Court is the motion for summary judgment submitted by Defendants Edwards Angell, LLP (EA) and James Barnett, Esq. (Barnett) (collectively the Defendants) pursuant to Super. R. Civ. P. 56. The American Kennel Club Museum of the Dog (Dog Museum) and Robert A. Ragosta (Ragosta) (collectively the Plaintiffs) have timely filed an objection to the motion
 Facts/Travel
Much of the underlying facts of this matter were set out by the United States District Court for the District of Rhode Island in The DogMuseum, a/k/a The American Kennel Club Museum of the Dog v. Ragosta, etal, C.A. No. 97-486-T, March ___, 1999, Torres, J (Dog Museum Litigation I). On December 23, 1976, Camilla Lyman (Lyman) established the Camilla Lyman Unitrust (Unitrust) and funded it with approximately $1,089,379.77 in assets. Id. at 1. The Unitrust qualified as a charitable remainder Unitrust, as defined by § 664(d) of the Internal Revenue Code. Id. The terms of the Unitrust provided for annual distributions to Lyman during her lifetime equal to eight percent of the net fair market value of the trust's assets as of the first business day of each taxable year.Id. at 1-2. Upon Lyman's death, the remaining Unitrust assets were to be distributed to the charitable organizations she had designated. Id. Originally, the Unitrust named the American Cancer Society, Inc., Ducks Unlimited Foundation, Inc., and the Buddy Dog Humane Society, Inc. as the remainder beneficiaries of the Unitrust. (Article III Unitrust.) However, on September 2, 1986, Lyman named the Dog Museum of America as the sole remainder beneficiary of the Unitrust upon her death. (Pls.' App. B.) Initially, Lyman named Alexander A. Bove, Jr. and Charles J. Evans as co-trustees of the Unitrust. However, on February 28, 1986, Bove and Evans resigned as trustees and Ragosta and George T. O'Neil (O'Neil) were appointed as successor co-trustees. (Pls.' App. C.) Defendants helped to facilitate the resignation of the previous co-trustees and the appointment of Ragosta and O'Neil as the successors. (Pls.' App. H; Ragosta Dep. on 1/19/01 at 30-33.) The Unitrust assets had an approximate fair market value of $1,058,856.74 at the time Ragosta and O'Neil took control. (Dog Museum Litigation I at 2.) Ragosta and O'Neil also served as Lyman's attorneys in fact during their administration of the Unitrust. Id. at 3. Lyman had executed powers of attorney over her personal assets to O'Neil on October 29, 1984 and to Ragosta on March 7, 1985. (Pls.' App. D.) In addition, in her last will and testament, Lyman named Ragosta the executor of her estate and O'Neil her sole beneficiary. (Defs.' App. F.)
On or about July 20, 1987, Lyman disappeared. Her remains were eventually discovered in the septic system of her home some ten years after her disappearance. However, for several years after her disappearance, O'Neil and Ragosta continued managing Lyman's affairs and preserving her property with the expectation that she would return. O'Neil and Ragosta insist that they believed Lyman merely traveled to Europe to obtain a sex change operation.[1]
In the fall of 1988, the trustees of a trust established in Massachusetts for Lyman's benefit (Massachusetts Trustees) announced their intention to cease distributions to Lyman due to her disappearance. (Ragosta Dep. on 1/19/01 at 45-46.) Ragosta and O'Neil contacted Defendants in their effort to compel the Massachusetts Trustees to continue making distributions.[2] The Massachusetts Trustees sought instructions from a Massachusetts Court regarding their decision. Id. at 47. In addition, the Massachusetts Trustees brought an action in Massachusetts naming Ragosta and O'Neil as party respondents. Id. A motion to compel production of certain financial records or to produce an accounting of their expenditures of funds on behalf of Lyman was directed to Ragosta and O'Neil. Id. at 48. However, these documents were never produced and eventually Ragosta and O'Neil entered into a settlement agreement with the Massachusetts Trustees that ceased any distributions to or on behalf of Lyman.[3] Late in 1988, the Massachusetts Trustees ceased distributing funds to Lyman.
In 1989, Ragosta and O'Neil transferred and accepted a portion of Lyman's Hopkinton property into the Unitrust in an attempt to generate income. (Dog Museum Litigation I at 4.) However, the property failed to produce any income and instead became a liability for the Unitrust. Id. The property generated maintenance, taxes, insurance and other expenses from 1988 through 1995 in the amount of $130,854.96. Id. If these funds remained invested at a reasonable rate of return, the Unitrust would contain an additional approximate amount of $350,000 as of March 1, 1999. Id. In addition, this property transfer resulted in a potential tax liability to the IRS for Lyman's personal tax bill to the extent of the property's value. Id. Defendants, however, were not involved in this transaction.[4]
A few days after Lyman's disappearance in July 1987, Ragosta and O'Neil became aware that the Internal Revenue Service (IRS) had issued a notice to Lyman regarding her failure to file tax returns for the years 1981 to 1986. (O'Neil Dep. on 10/19/00 at 56; Ragosta Dep. on 1/19/01 at 102.) Ragosta worked with Fred Lombardi, another attorney at EA, to negotiate the tax deficiency. (Ragosta Dep. on 1/19/01 at 98.) On January 23, 1991, Ragosta and O'Neil, acting as Lyman's attorneys-in-fact, reached a settlement with the IRS in the United States Tax Court whereby the tax deficiency for the years 1981 through 1986 was assessed at $500,000.Lyman v. Commissioner of Internal Revenue, Docket No. 3489-90, Nims, J. (Decision). However, Ragosta and O'Neil failed to pay this deficiency amount, which prompted the IRS to serve notices of lien against Lyman's Hopkinton property in May 1992. (O'Neil Dep. on 10/19/00 at 94-95; Ragosta Dep. on 7/12/01 at 71.)
Ragosta and O'Neil consulted Defendants regarding possible means of financing the deficiency payment. (Ragosta Dep. on 1/19/01 at 110; O'Neil Dep. on 10/19/00 at 48-49.) Ragosta testified that he "asked [Barnett] by explaining what I wanted to do. I wanted — I said what we would like to do is this: Transfer the property into the Unitrust, satisfy the IRS obligation and sell the property to reimburse the Unitrust." (Ragosta Dep. on 1/19/01 at 110.) Ragosta further stated that Barnett responded, "[w]ell, okay, let's order the appraisals, let me order the appraisals."Id. at 111. One of the statements in notes taken by Barnett states "[g]et appraisal of unitrust land. Pay over $ = FMV to IRS." (Pl.'s App. L.)
In June 1992, Ragosta and O'Neil sold the remainder of Lyman's Hopkinton property, including the house and kennel, to the Unitrust in exchange for the Unitrust's payment of $490,400 to the IRS for Lyman's personal tax liability. (Dog Museum Litigation I at 4.) Also, in 1992, Ragosta and O'Neil cashed certain mutual fund assets to pay the IRS for Lyman's personal tax liability. Id. at 4-5. They redeemed $304,594 from Keystone 100, $110,025 from Kemper funds, and $108,441 from Seligman funds. Id. at 5. If these funds had remained invested at a reasonable rate of return, the Unitrust would have earned significant income. Id. Instead, the Unitrust sustained a gross loss from the Hopkinton property transactions of approximately $1,257,400. Id. In August 1992, Ragosta executed a check payable to the IRS using Unitrust funds. (Ragosta Dep. on 1/19/01 at 118.) It was not until October of 1992 that Ragosta informed Defendants of this action. Id. at 139-40.
In addition, there was another trust administered in Massachusetts that was scheduled to terminate and distribute substantial assets to its beneficiaries, including Lyman. Id. at 133. However, a provision in the trust provided that if Lyman died prior to the termination of the trust, then Lyman would not be entitled to any distribution from the liquidation of the trust. Id. The Lyman family instituted an action in the Hopkinton Probate Court to have Lyman's date of death declared as of July 20, 1987. Id. at 99. Ragosta and O'Neil retained Defendants to oppose this action. Id. at 100. On June 6, 1995, the Hopkinton Probate Court officially declared Lyman's date of death to be July 20, 1987. Estate ofCamilla Lowell Lyman, Probate No. 94-10, June 1, 1995.[5]
Subsequently, in 1996, Ragosta and O'Neil sold the Hopkinton property for only $260,000. (Dog Museum Litigation I at 4.) The Unitrust received $50,000 in cash and took back a $210,000 mortgage from the purchaser, Gardner Young, Jr. (Young). Id. At the closing, the Unitrust paid costs and expenses, including brokerage commissions and back real estate taxes, totaling at least $26,221. Id. In 1997, the Unitrust received principal/interest payments on the Young mortgage of approximately $216,215. Id.
In 1997, the Dog Museum brought suit against Ragosta and O'Neil in the United States District Court of Rhode Island alleging that the "[t]rustees acted negligently and in breach of their fiduciary duties in several respects." (Third Party Compl. at 2.) This litigation was settled and a judgment was entered against the co-trustees for $900,000, plus interest and costs. (Dog Museum Litigation I at 5.) As part of the settlement, the co-trustees entered into an agreement with the Dog Museum whereby Ragosta and Ragosta, Ltd. assigned to the Dog Museum certain claims against his/its insurance carrier, National Casualty Company. (Settlement Agreement at 4.) Moreover, the settlement agreement also provides that Ragosta and O'Neil will cooperate with the Dog Museum in a legal malpractice action against Defendants. Id.
Subsequently, National Casualty Company entered into a settlement agreement with Ragosta and the Dog Museum whereby the insurance company agreed to pay "$650,000 to the Dog Museum and $47,500 to Robert A. Ragosta . . . in full and complete satisfaction of [its] obligations" under the insurance contract. See Settlement and Policy Agreement at 3. In addition, the agreement contained the following provision:
 "National Casualty hereby assigns its subrogation rights to The Dog Museum as against the law firm Edwards Angell ("EA") to the extent that any legal services rendered by EA to Robert A. Ragosta and/or George T. O'Neil concerning, related, attributable, based upon or arising out of Robert A. Ragosta's having acted as a trustee of the Camilla Lyman Unitrust, executor of the Camilla Lyman Estate or attorney in fact for Camilla Lyman may have given rise to the damages claimed by The Dog Museum and the payments made under this Agreement by National Casualty, said assignment being made pursuant to the terms of an Assignment Agreement attached hereto as Exhibit `A.'" Id. at 4.
Finally, on May 24, 2000, the Dog Museum and Ragosta filed an action against Defendants for breach of fiduciary duty and legal malpractice. Subsequently, on July 14, 2000, Defendants moved to dismiss the complaint arguing that they owed no duty to the Dog Museum as a matter of law and that the assignment of Ragosta's malpractice claim to the Dog Museum was invalid. On September 19, 2000, this Court denied Defendant's motion to dismiss. American Kennel Club Museum, et al v. Edwards Angell, et al,
C.A. No. PC 00-2683, September 19, 2000, Hurst, J. (Order).
Defendants' have timely filed a motion for summary judgment. Defendants advance a number of arguments in support of their summary judgment motion, the most significant of which is that the attorney of a trustee owes no duty of care to the beneficiaries of a trust. Thus, Defendants insist that they owed no duty of care to the Dog Museum and are entitled to judgment as a matter of law. In addition, Defendants maintain that Ragosta is not a proper party to this action because he has assigned his claims to the Dog Museum. Defendants contend that the assignment of a legal malpractice claim is void as contrary to Rhode Island law and public policy. Moreover, Defendants maintain that Ragosta's claims, brought in his capacity as co-trustee, cannot survive summary judgment because Defendants did not breach their duty to the co-trustees. Defendants assert that the allegedly erroneous advice, upon which the co-trustees relied, was never provided to the co-trustees. However, assuming that such advice was given, Defendants argue there was no breach of duty because the advice offered was substantially correct. Moreover, Defendants insist that even if there were a breach of duty to the co-trustees, there has been an invalid assignment of the co-trustees' claims to the Dog Museum. Thus, Defendants argue that the Court should grant their motion for summary judgment. In the alternative, Defendants aver that they are entitled to partial summary judgment limiting Plaintiffs' damages to the amounts purportedly caused by Defendants' actions.
 Standard of Review
Super. R. Civ. Proc. 56 empowers a trial justice, upon proper motion, to enter summary judgment in favor of the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Thus in a proceeding for summary judgment, the court must "examine the pleadings and affidavits in the light most favorable to the nonmoving party to decide whether an issue of material fact exist[s] and whether the moving party [is] entitled to summary judgment as a matter of law." Buonnanno v. Colmar Belting Co., Inc.,733 A.2d 712, 715 (R.I. 1999) (citing Textron, Inc. v. Aetna Casualty andSurety Co., 638 A.2d 537, 539 (R.I. 1994)). The party opposing a motion for summary judgment may not merely rely upon mere allegations or denials in his or her pleadings. Small Business Loan Fund v. Loft, 734 A.2d 953, 955 (R.I. 1998) (citing Bourg v. Bristol Boat Co., 705 A.2d 969, 971 (R.I. 1998)). Rather "[a] party who opposes a motion for summary judgment carries the burden of proving by competent evidence the existence of a disputed material fact and cannot rest on the allegations or denials in the pleadings or the conclusions or on legal opinions." Macera Brothersof Cranston, Inc. v. Gelfuso Lachut, Inc., 740 A.2d 1262, 1264 (R.I. 1999) (citing Manning Auto Parts, Inc. v. Souza, 591 A.2d 34, 35 (R.I. 1991)). If the opposing party cannot establish the existence of a genuine issue of material fact, summary judgment must be granted. Grande v.Almac's, Inc., 623 A.2d 971, 972 (R.I. 1993).
 Choice of Law[6]
The parties have advanced differing notions as to whether the law of Massachusetts or the law of Rhode Island should govern this breach of fiduciary duty and legal malpractice action. Defendants argue that since the choice of law provision contained in Article IX of the Unitrust specifies that the trust is to be governed by Massachusetts law, then these proceedings should also be governed by Massachusetts law. (Def.'s Mem. of Law at 14 n. 10.) Article IX of the Unitrust states the Unitrust "shall be construed, governed, and administered according to the laws of Massachusetts." Plaintiffs, on the other hand, have relied on Rhode Island law as the governing law in the instant matter.
The Rhode Island Supreme Court has held that "[a]s a general rule, parties are permitted to agree that the law of a particular jurisdiction will govern their transaction." Sheer Asset Mgmt. Partners, Inc. v. LauroThin Films, Inc., 731 A.2d 708 (R.I. 1999) (citations omitted). However, there are some limitations to the recognition of choice of law clauses.Owens v. Hagenbeck-Wallace Shows Co., 58 R.I. 162, 172, 192 A. 158, 164 (1937). The Court has previously stated that "the right of parties to a contract to have their reciprocal duties and obligations under that contract governed by the law of some particular jurisdiction is limited to the selection or stipulation by them of the law of a jurisdiction which has a real relation to the contract." Id. at 174. The instant action, however, relates to the alleged negligence and breach of fiduciary duty by Defendants in their capacity as attorneys for the co-trustees and the beneficiaries of the Lyman trust. The Massachusetts choice of law provision in the trust document applies only to the construction, governance and administration of the Unitrust. Thus, the choice of law provision has no connection to this legal malpractice and breach of fiduciary duty action commenced in Rhode Island. Accordingly, Rhode Island law applies in this matter.
 Law of the Case
Plaintiffs argue that Defendants' motion for summary judgment should be denied under the law of the case doctrine. Plaintiffs insist that the issues before the Court today were decided in its favor a year and a half ago and that ruling should not be disturbed. See American Kennel ClubMuseum, et al v. Edwards Angell, et al, C.A. No. PC 00-2683, September 19, 2000, Hurst, J. (Order). Defendants maintain, however, that the denial of their motion to dismiss does not preclude the assertion of the same legal principle in support of their motion for summary judgment.
"The law of the case doctrine provides that after one judge has decided an interlocutory motion in a pending suit a second judge should refrain from disturbing the first ruling when confronted with the same question at a later stage of the suit." Cipolla v. Rhode Island College,742 A.2d 277, 280 (R.I. 1999) (citing Commercial Union Insurance Co. v.Pelchat, 727 A.2d 676, 683 (R.I. 1999)). The doctrine serves a useful purpose in "ensur[ing] the stability of decisions and avoid[ing] unseemly contests between judges that could result in a loss of public confidence in the judiciary." Id. However, the doctrine's use is limited because it "applies only when the question that reaches the second judge is the same one that has already been decided by the first judge." Id. (citing Shayerv. Bohan, 708 A.2d 158, 164 (R.I. 1998)).
In the instant case, the first trial justice noted that the matter before her involved a "12(b)(6) motion. The question is whether or not it's inconceivable that under any set of facts there could never be a duty." (Tr. of Sept. 19, 2000 hearing at 5.) Thus, the facts of the instant case mirror those in Cipolla, where the court stated that "the first motion justice decided only the motion to dismiss and not the motion for summary judgment; hence, his decision did not bar consideration of the summary judgment motion by the second justice."Cipolla, 742 A.2d at 280. The court further explained that "[a] motion to dismiss must be made strictly on the pleadings, and under Rule 12(c), a motion to dismiss that relies on facts outside the pleadings must be treated as a Rule 56 motion for summary judgment." Id. (citations omitted). Thus, Defendants' motion for summary judgment cannot be denied on the basis of the law of the case doctrine.
 Standing
Defendants first argue that they are entitled to judgment as a matter of law because the attorney to a trustee owes no duty of care to the beneficiaries of a trust. Defendants maintain that their duty rested solely with Ragosta, in his capacity as co-trustee of the Lyman trust, and that they owed no duty of care to the Dog Museum, the ultimate beneficiary of the trust. Defendants insist that the imposition of such a duty would create a conflict of interest between the trustee and the beneficiaries. Furthermore, Defendants argue that summary judgment should enter in their favor because Ragosta has invalidly assigned his claims to the Dog Museum.
However, Plaintiffs respond that this legal malpractice and breach of fiduciary duty action has been brought in the names of both the Dog Museum, as sole beneficiary of the Lyman trust, and Ragosta, in his capacity as co-trustee of the Lyman trust. Thus, Plaintiffs insist that both the Dog Museum and Ragosta have standing to prosecute these claims. Ragosta as co-trustee of the Lyman trust is obligated to institute an action that will protect the trust estate. In addition, Plaintiffs argue that the attorney to a trustee does owe a duty of care to the beneficiaries of a trust. Thus, the Dog Museum, as a real party in interest, is a proper party to this legal malpractice and breach of fiduciary duty action. Finally, Plaintiffs contend that even if Ragosta is found to have assigned his claims to the Dog Museum, such an assignment is permissible under Cerberus Partners, L.P. v. Gadsby Hannah, 728 A.2d 1057 (R.I. 1999).
 Duty to Beneficiaries of a Trust
An action based on a claim of legal malpractice "requires proof that actual damages resulted from the attorney's alleged breach of the duty arising out of the attorney-client relationship." Vallinoto v. DiSandro,688 A.2d 830, 836 (R.I. 1997). However, a review of Rhode Island case law reveals that our state Supreme Court has not had occasion to address whether an attorney owes a duty of care to a third party. Defendants maintain that there are inherent conflicts of interest that prohibit the recognition of a duty of care from the trustee's attorney to the beneficiaries of a trust. Defendants assert that this Court should adopt the rule followed by several jurisdictions that no duty exists between a trustee's attorney and the beneficiaries of the trust. See Spinner v.Nutt, 417 Mass. 549, 553 (1994). Alternatively, Plaintiffs respond that "most courts today recognize a duty between a lawyer and third parties." (Pls.' Mem. of Law at 17.) To support this assertion, Plaintiffs direct this Court's attention to those jurisdictions where a duty between a trustee's lawyer and the beneficiaries of a trust have been established.See Elam v. Hyatt Legal Services, 541 N.E.2d 616 (Ohio 1989), Charlesonv. Hardesty, 839 P.2d 1303 (Nev. 1993), and Morales v. Field,160 Cal.Rptr. 239 (Cal.App. 1980).[7] In addition, Plaintiffs rely on several cases where courts have recognized a duty of care owed by an attorney who has drafted a will to the beneficiaries of that will. (Pls.' Mem. of Law at 18.) Finally, Plaintiffs argue that the Rhode Island Supreme Court's abandonment of the privity requirement in negligence actions[8] and the balancing test applied in determining whether a duty of care exists to sustain a negligence action[9] support the recognition of a duty of care owed by an attorney to a third party.
Defendants insist that the establishment of a duty of care between the trustee's attorney and the beneficiaries of a trust exposes the trustee's attorney to the danger of both potential and actual conflicts of interest. Defendants argue that in the instant matter, there was an actual conflict between the interests of Lyman, the current beneficiary, and the Dog Museum, the remainderman beneficiary. (Defs.' Mem. of Law at 14.) According to Defendants, despite Lyman's disappearance, she had "an interest in retaining her right to distributions from the Unitrust during her absence, and in using those distributions for the maintenance of her property." Id. In stark contrast, it was in the Dog Museum's interest to "hav[e] Lyman declared dead promptly, or in having distributions from the Unitrust cease." Id. In support of their claims, Defendants rely onSpinner v. Nutt, 417 Mass. 549, 554-55 (1994), wherein four of sixty-eight income and remaindermen beneficiaries brought an action against trustees' attorneys for damages from the loss of value of the trust. The Supreme Judicial Court of Massachusetts explained that "an attorney is not `absolutely insulated from liability to nonclients.'"Id. at 552 (citing Page v. Frazier, 388 Mass. 55, 65 445 N.E.2d 148
(1983)). However, the court was less likely to impose a duty to a third party "where an attorney is also under an independent and potentially conflicting duty to a client." Id. The Spinner court focused on the potential for conflict rather than the existence of an actual conflict between the interests of the trustees and the beneficiaries. Id. The court noted "not only did the two trustees disagree on the sale of the newspaper, but the plaintiffs are only four of sixty-eight beneficiaries of the trust. It is entirely likely that the class of beneficiaries also would have disagreed among themselves." Id. at 554. The court further explained:
 "[i]n the course of administering a trust, a trustee may be required to make difficult decisions with regard to his or her duties to the beneficiaries. A trustee's attorney guides the trustee in this decision-making process. That the interests of the trustee and the interests of the beneficiaries may at times conflict cannot seriously be disputed. . . . Should we decide that a trustee's attorney owes a duty not only to the trustee but also to the trust beneficiaries, conflicting loyalties could impermissibly interfere with the attorney's task of advising the trustee. This we refuse to do." Id. at 555.
Plaintiffs, on the other hand, argue that this Court should follow those jurisdictions that have established a duty of care from the trustee's attorney to the beneficiaries of a trust. Plaintiffs insist the recognition of such a duty does not inherently create conflicts of interest. In the instant case, Plaintiffs assert that there was no conflict of interest between the interests of the co-trustees and the remainderman beneficiary. Instead, the proper preservation of the Unitrust assets was an interest common to both the co-trustees and the Dog Museum as beneficiary. This identity of interests mirrors those in various cases where courts have held a trustee's attorney to owe a duty of care to trust beneficiaries. For example, Morales v. Field,99 Cal.App.3d 307, 316, 160 Cal.Rptr. 239, 244 (Cal.App. 1980), involved a malpractice action brought by the beneficiary of a trust for the trustee attorneys' failure to disclose their dual representation in a loan guarantee transaction involving the trust. The Morales court held that the trustees' attorney owed a duty to the beneficiaries to disclose this dual representation. Id. The court explained:
 "[a]n attorney who acts as counsel for a trustee provides advice and guidance as to how that trustee may and must act to fulfill his obligations to all beneficiaries. It follows that when an attorney undertakes a relationship as adviser to a trustee, he in reality also assumes a relationship with the beneficiary akin to that between trustee and beneficiary." Id.
Another instructive case is Charleson v. Hardesty, 839 P.2d 1303 (Nev. 1993), where the beneficiaries of a trust sued the trustee's lawyer claiming that the lawyer failed to properly advise the trustee of his fiduciary duties. The court stated "when an attorney represents a trustee in his or her capacity as trustee, that attorney assumes a duty of care and fiduciary duties toward the beneficiaries as a matter of law." Id. at 1306-1307.
This Court finds persuasive the rationale relied upon by those courts that have found a trustee's attorney owing a duty of care to trust beneficiaries. See Charleson v. Hardesty, 839 P.2d 1303 (Nev. 1993), andMorales v. Field, 160 Cal.Rptr. 239 (Cal.App. 1980). Moreover, the reasoning employed by jurisdictions that have recognized a duty of care is consistent with a recent order issued by this Court in Prince v.Whitehouse, C.A. No. 99-5806, April 22, 2002, Silverstein, J (Order). There the issue before the Court was whether the trustee's attorney was required, in response to a request from the beneficiaries, to produce "[a]ll documents relating to any legal advice obtained and paid by the trustees in connection with the administration of the trust. . . . [and] all billings, statements, invoices, and any other documents showing the amount of money paid by the trustees for legal advice in connection with the administration of the trust." Id. at 2. This Court stated that it could not "in its thinking conclude other than that the attorney/client relationship between the trustees . . . and their counsel has to be broad enough to include . . . the parties truly interested in the administration of the trust; to wit, the beneficiaries." Id. at 4. Thus, the Court directed that the documents be "turned over to counsel for the dissident beneficiaries." Id.
In arriving at this decision, the Court considered cases from several jurisdictions, including Riggs National Bank v. Zimmer, 355 A.2d 709
(Del.Ch. 1976), Huie v. Deshazo, 922 S.W.2d 920 (Tex. 1996), and WellsFargo Bank v. Boltwood, 22 Cal.4th 201 (2000). In Riggs, 355 A.2d at 710, the beneficiaries filed a motion to compel production of a legal memorandum prepared by the trustee's attorney in connection with a pending petition for instructions and in anticipation of potential tax litigation on behalf of the trust. The trustees asserted both the attorney-client privilege and the work product privilege in their refusal to produce the documents. Id. The court held that the beneficiaries were entitled to inspect these documents and, that under the circumstances, the beneficiaries were at least as much clients as were the trustees such that the attorney-client privilege did not prohibit disclosure. Id. The court explained:
 "[a]s a representative for the beneficiaries of the trust which he is administering, the trustee is not the real client in the sense that he is personally being served. And, the beneficiaries are not simply incidental beneficiaries who chance to gain from the professional services rendered. The trustees here cannot subordinate the fiduciary obligations owed to the beneficiaries to their own private interests under the guise of attorney-client privilege. . . . The fiduciary obligations owed by the attorney at the time he prepared the memorandum were to the beneficiaries as well as to the trustees. In effect, the beneficiaries were the clients . . . as much as the trustees were, and perhaps more so." Id. at 713-14.
By requiring the trustees in Prince to deliver the documents sought by the beneficiaries, this Court rejected the holdings in Huie and WellsFargo Bank. In Huie, 922 S.W.2d at 921, the Supreme Court of Texas stated "nothwithstanding the trustee's fiduciary duty to the beneficiary, only the trustee, not the trust beneficiary, is the client of the attorney."Id. Similarly, the Supreme Court of California, in Wells Fargo Bank, 22 Cal.4th at 212, opined that "`[t]he attorney for the trustee of a trust is not, by virtue of this relationship, also the attorney for the beneficiaries of the trust. The attorney represents only the trustee.'" The notion that a trust beneficiary, not merely the trustee, is the client of the trustee's attorney supports the acknowledgement of a duty of care from the trustee's attorney to the beneficiary. Given this Court's determination that a trustee's attorney owes a duty of care to the trust beneficiaries, the Dog Museum, as the ultimate beneficiary of the Lyman trust, has standing to bring suit against Defendants for legal malpractice and breach of fiduciary duty.
 Assignment of Legal Malpractice Claim
Defendants next argue that summary judgment should be entered in their favor because Ragosta has invalidly assigned his claim to the Dog Museum. Defendants maintain that the claims brought in co-trustee Ragosta's name are a "sham." (Def.'s Mem. of Law at 16.) Defendants insist that under the settlement agreement between Plaintiffs, Ragosta assigned his legal malpractice claims against EA, which are now being prosecuted by the Dog Museum in Ragosta's name. Id. Thus, Defendants maintain that co-trustee Ragosta is not a real party in interest as required under Super. R. Civ. P. 17, which states:
 "[e]very action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in that person's own name without joining the party for whose benefit the action is brought."
Furthermore, "if [plaintiff] has assigned all interest in the claim before the action is instituted, he is no longer a real party in interest." Wright, Federal Practice and Procedure, § 1542 at 328 (2d ed. 1990). Plaintiffs initially respond that there has been no assignment of Ragosta's claims to the Dog Museum. In support of this assertion, Plaintiffs rely on the plain language of the settlement agreement between Ragosta and the Dog Museum. Plaintiffs note that the settlement agreement evidences the Dog Museum's desire to ensure that Ragosta would cooperate in the prosecution of any legal malpractice action against Plaintiffs. The settlement agreement contains the following provision:
 "[t]o the extent requested by the Dog Museum, Ragosta and O'Neil, individually and in their capacity as Co-Trustees of the Unitrust, shall cooperate fully (including participation as named plaintiffs) with the Dog Museum in the timely filing and prosecution of a legal malpractice claim against the law firm of Edwards Angell and the individual lawyers who represented the Unitrust. Ragosta and O'Neill agree that the Dog Museum shall have the right to prosecute such claims in their individual names as Co-Trustee or otherwise and that the Dog Museum shall control the settlement and conduct of such litigation. Ragosta and O'Neill shall cooperate fully and testify completely and truthfully in support of such claims to the extent the Dog Museum deems such testimony or cooperation necessary." (¶ 6 at 4 and 5.)
Plaintiffs insist that the language employed to guarantee Ragosta's assistance to the Dog Museum in its legal endeavors against Defendants differs significantly from assignment provisions in the settlement agreement. First, Plaintiffs note the absence of the word "assignment" in the provision quoted above. In addition, Plaintiffs observe that in other provisions in the settlement agreement, Ragosta does assign certain of his claims to the Dog Museum. For example, paragraph 4 of the settlement agreement provides:
 "Ragosta and Ragosta, Ltd. hereby assign to the Dog Museum all of his/its claims, rights and causes of action against National Casualty, or any other insurance carrier (including Twin City, if applicable) for indemnification and coverage concerning the claims detailed in the Findings of Fact and Judgment. Ragosta and Robert A. Ragosta, Ltd. retain all rights and interest in their bad faith claim against National Casualty. Ragosta and Ragosta, Ltd. also hereby assign to the Dog Musueum all of his/its claims, rights and causes of action against Andrew A. Biggio and/or First Union Insurance Agency, Inc., if any, for negligence or otherwise, arising out of their acquisition and sale of insurance coverage, including fiduciary coverage to Ragosta or Ragosta, Ltd. Ragosta and Ragosta, Ltd. agree that the Dog Museum shall have the right to prosecute all such claims assigned in his/its name. Ragosta and O'Neil shall cooperate fully and testify completely and truthfully in support of such claims to the extent the Dog Museum deems such testimony or cooperation necessary."
Thus, Plaintiffs maintain that Ragosta and the Dog Museum were well aware of how to draft an assignment but chose not to do so with Ragosta's legal malpractice and breach of fiduciary duty claims against Defendants.
This Court finds, however, that it is unnecessary to determine whether Ragosta assigned his claims against Defendants to the Dog Museum. Even assuming that Ragosta assigned his claims, such an assignment of legal malpractice claims has been deemed valid by the Rhode Island Supreme Court in Cerberus Partners, L.P. v. Gadsby Hannah, 728 A.2d 1057 (R.I. 1999). In Cerberus, assignees of commercial loan agreements brought a legal malpractice action against law firms and attorneys who represented the original lender. Id. The plaintiff assignees alleged that the defendant attorneys and law firms failed to perfect the original lenders' security interest in SLM International, Inc.'s assets and, upon SLM's bankruptcy petition, the assignees were unable to collect the full value of the loans they had purchased from the lenders. Id. at 1057-58. The Court held that "the assignment of legal malpractice claims as part of a larger commercial transaction, such as the one in this case, are permitted under Rhode Island law." Id. 1059. In arriving at this conclusion, the Court drew a distinction between "the voluntary assignment of a bare legal claim for malpractice and the assignment of a claim for malpractice that is part of a general assignment in a commercial setting and transaction that encompasses a panoply of other assigned rights, duties, and obligations." Id. The Court explained that in Cerebrus
 "the plaintiffs acquired, along with those loans, all of the attendant obligations and rights that went along with those loans, including but not limited to the Lenders' legal malpractice action against the defendant. Thus, we are not dealing here with a situation where a legal malpractice claim was transferred to a person without any other rights or obligations being transferred along with it." Id. at 1059.
The voluntary assignment of the legal malpractice claim by Ragosta to the Dog Museum is permissible under Rhode Island law. The various concerns raised by the Rhode Island Supreme Court in Cerebrus are not violated with the validation of the assignment of the legal malpractice claim in the instant matter. The assignment in the instant case is similar to "market assignments involving purely economic transactions" rather than to "freestanding malpractice personal injury" claims. Id. at 1060. Moreover, the concomitant dangers associated with the assignment of legal malpractice claims that concerned our Supreme Court in Cerebrus,
including "the creation of possible commercial markets for such claims; and the demeaning of the legal profession along with the prospect of having attorneys defend themselves against strangers and the possibility of being forced to divulge confidential lawyer-client information in defending against assigned claims" are not present here. Id. Since the legal malpractice claim in the instant matter "was not bartered or sold to an unrelated third party" because the Dog Museum's liabilities, which were assumed from Ragosta, "arose directly out of [Defendants'] conduct," the legal malpractice claim could be assigned. Id. at 1061 (quotingRichter v. Analex Corp., 940 F. Supp. 353 (D.D.C. 1996)). This Court is not "confronted with the establishment of a general market for such claims" rather as the ultimate beneficiary to the Lyman trust, the Dog Museum, as the "assignee has an intimate connection with the underlying lawsuit." See Thurston v. Continental Casualty Co., 567 A.2d 922 (Me. 1989). Finally, allowing the assignment of Ragosta's legal malpractice claim to the Dog Museum does not serve to offend the legal profession. As the Pennsylvania Supreme Court aptly noted in Hedlund Mfg. Co. v.Weiser, Stapler Spivak, 517 Pa. 522, 539 A.2d 357 (1988), courts "will not allow the concept of the attorney-client relationship to be used as a shield by an attorney to protect him or her from the consequences of legal malpractice. Where an attorney has caused harm to his or her client, there is no relationship that remains to be protected." Id. at 526.
Finally, even if this Court were to deem the assignment of his legal malpractice claims to the Dog Museum invalid, Ragosta, in his capacity as co-trustee of the Lyman trust, would have standing to bring a legal malpractice and breach of fiduciary duty action against Defendants.
 Advice was Substantially Correct
Defendants next argue that even if Plaintiffs are able to establish the existence of a duty of care, nonetheless Plaintiffs' claims cannot survive summary judgment because there has been no breach of the duty of care. First, Defendants maintain that Barnett never furnished the advice he is alleged to have supplied to the co-trustees. However, Defendants insist that even taking the facts in the light most favorable to the Plaintiffs, that is even assuming Barnett gave the purported advice to Plaintiffs, there was still no breach of the duty of care because the advice was "substantially correct." (Defs.' Mem. of Law at 22.) Plaintiffs contend, however, that the advice provided by Barnett to the co-trustees was incorrect according to "Barnett's own admission." (Pls.' Mem. of Law at 25.)
According to Defendants, the co-trustees were properly advised that they were permitted by law to make distributions from the trust for the benefit of an absent beneficiary. Defendants insist that the Unitrust was governed by Massachusetts law pursuant to the choice of law provision contained in Article IX of the trust document. Id. Under Mass. Gen. Laws ch. 203, § 32, an absent beneficiary is presumed dead after fourteen years. An EA research memorandum, dated June 16, 1992, evidences that Defendants investigated and examined the presumption of death law in Massachusetts and Rhode Island. (Defs.' App. O.) The memorandum stated:
 "[t]he three Massachusettes [sic] trusts to which Ms. Lyman is a beneficiary should be governed by Massachusettes [sic] law. Massachusettes [sic] case law demonstrates that the devolution of testamentary trust property is governed by the law of the testator's domicile. In cases of trusts created inter vivos, the trust is governed by the rules of the state with which the trust has its most significant relationship. These choice of law provisions are synonymous with Rhode Island General Laws, § 18-1-1
through § 18-1-3 (1956). The settlers of the three trusts at issue in this case were domiciled in the state of Massachusettes [sic] when the trusts were created. The property which is the subject of the trusts is located in Massachusettes [sic]. The administrators of the trusts are located in Massachusettes[sic]. These facts demonstrate that under applicable rules the trusts should be governed by Massachusettes [sic] law." Id. at 2-3.
Defendants maintain that this analysis supported their advice to the co-trustee that they were permitted under the Massachusetts statutory period for the presumption of death to continue making distributions from the Lyman trust despite Lyman's absence. Id. Defendants assert that this "position would have been defensible through 2001." (Defs.' Mem. of Law at 23.) However, Barnett's own testimony, that he advised the co-trustees in May 1992 to seek instructions from the court regarding Lyman's disappearance and continued distributions of the Unitrust, belies the arguments advanced by Defendants. Barnett stated:
 "[t]he unitrust had [t]he Dog Museum as the ultimate beneficiary. Cam Lyman had dis-it was determined by the Rhode Island court to have disappeared in 1987. The unitrust was established in Massachusetts, with Massachusetts trustees, subsequently it was administered in Rhode Island. Conflict of laws is evident. Rhode Island has a four-year statute regarding death. Massachusetts, in trust matters, applies a 14-year presumption of death. At this time, she was dead in Rhode Island but alive in Massachusetts, she is still alive in Massachusetts." (Barnett Dep. on 9/15/98 at 19-20.)
There is also a disagreement between the parties regarding other advice purportedly given the co-trustees by Defendants. According to Defendants, the contested advice concerns information provided to the co-trustees about their ability to exceed the eight percent annual distribution limitation imposed on the Unitrust. (Defs.' Mem. of Law at 23.) Once again, Defendants "categorically deny ever" having advised the co-trustees that such actions were permitted by law. Id. at 24. However, Defendants insist that even if such advice were given Plaintiffs could not survive summary judgment because such advice is correct. Id. Defendants maintain that a trustee may pay a beneficiary more than the allowable distribution under the trust although the beneficiary is liable to reimburse the trust for the overpayments. Id. It appears, however, that this advice is not in dispute given that Ragosta's own testimony supports
Defendants' position that Defendants did not advise the co-trustees that distributing funds in excess of the eight percent limitation was permissible under the law. (Ragosta Dep. at 114.) Rather, the disputed advice is the advice purportedly provided by Defendants to the co-trustees that the sale of Lyman's Hopkinton property to the Unitrust in order to satisfy a $490,000 tax deficiency assessed against Lyman personally was permissible under the law. As indicated previously, Ragosta utilized EA, in particular, Fred Lombardi, to assist with negotiations of Lyman's tax deficiency payments for the years 1981 through 1986. Despite an agreement that was reached with the IRS, the co-trustees did not immediately pay the settlement amount, which led to the IRS's placing liens on Lyman's Hopkinton property. At this time, Ragosta approached Defendants regarding possible means to finance the deficiency payment. (Ragosta Dep. on 1/19/01 at 110; O'Neil Dep. on 10/19/00at 48-49.) According to Ragosta, he "asked [Barnett] by explaining what I wanted to do. I wanted — I said what we would like to do is this: Transfer the property into the Unitrust, satisfy the IRS obligation and sell the property to reimburse the Unitrust." (Ragosta Dep. on 1/19/01 at 110.) Ragosta claims that Barnett responded, "[w]ell, okay, let's order the appraisals, let me order the appraisals." Id. at 111. Co-trustee O'Neil's testimony differs significantly on this point in that he recalls Barnett conclusively informing him that the transaction was permissible. (O'Neil Dep. at 48.)
There is evidence in the record suggesting that such advice may have been provided by Barnett to the co-trustees. A statement in notes taken by Barnett states "[g]et appraisal of unitrust land. Pay over $ = FMV to IRS." (Pls.' App. L.) Also, other evidence indicates that Barnett investigated whether such a transaction was permissible. Barnett testified as follows:
 "Q: Take at look, if you would, at Page 6, and before you look at that, let me ask you this question. Did you personally make any effort by way of research to discern whether the Lyman Hopkinton property could be conveyed to one of the trusts?
 A: Yes.
 Q: What did you do?
 A: I was aware that dealings with unitrusts were governed by prohibited transactions, but I did know that reasonable compensation was allowable, but I did not know until I did the research that a sale for fair market value was permissible, and the research, as bolstered by my conversation with my partner, Ken Levine, indicted that no, there was no — that would be a prohibited transaction." (Barnett Dep. on 12/9/99 at 111.)
Despite this knowledge, it appears that Barnett did not inform the co-trustees of the impropriety of their planned actions. In previous deposition testimony, Barnett had stated:
 "Q: I will rephrase it. Did you tell Mr. Ragosta that it was improper for him to use unitrust cash to pay Ms. Lyman's personal tax liability?
 A: I think the answer would be no." (Barnett Dep. on 9/15/98 at 86.)
Moreover, billing records tend to show that in May 1992, Defendants conducted research on the issue of self-dealing and contacted real estate appraisers. (Pls.' App. O.) In addition, appraisals dated July 18, 1992 on Lyman's four Hopkinton properties, valuing the properties at $540,000, were submitted to Barnett. (Pls.' App. P.) Subsequently, Ragosta and O'Neil "sold the remainder of Lyman's Hopkinton property including the house and kennel to the Unitrust in exchange for the Unitrust's payment of $490,400 to the IRS for Lyman's personal tax liability." (Dog Museum Litigation I at 4.)
Defendants argue, however, that there was never a "sale" of Lyman's Hopkinton property to the Unitrust. (Defs.' Mem. of Law at 10-11 and n. 8.) Defendants note that the deed expressly provided that "[t]he consideration for this conveyance is such that no documentary stamps are required." (Defs.' Exhibit L.) Defendants rely on G.L. 1956 §44-25-1(b), which states "[i]n the event no consideration is actually paid for the lands, tenements, or realty, the instrument of conveyance shall contain a statement to the effect that the consideration is such that no documentary stamps are required." Thus, Defendants insist the transaction did not constitute a sale of property. Moreover, Defendants rely on Ragosta's testimony to support their contention that there was no sale of property to the Unitrust. (Ragosta Dep. on 1/19/01 at 140-41.) However, in the Stipulation of Fact and Judgment entered against Ragosta, the United States District Court for the District of Rhode Island characterized the transaction as a sale and stated that although "Ragosta and O'Neil believed that the Hopkinton property transactions were appropriate in their roles as Cam Lyman's attorneys in fact and neither profited personally from the transactions. . . . [T]he transactions violated the specific terms of the Unitrust and the [Internal Revenue Code of 1954]." (Dog Museum Litigation I at 4.) Thus, with respect to the contested advice purportedly provided by Defendants to the co-trustees regarding their administration of the trust, there remain genuine issues of material fact that preclude granting Defendants' motion for summary judgment.
 Limiting Plaintiffs' Recovery
Finally, Defendants argue that should Plaintiffs' claims survive summary judgment, the Court should enter partial summary judgment holding that Ragosta's claims should be capped at the "amount of his payment to the Dog Museum ($50,000 plus the present value of $175,000 over ten years at 0% interest) together with his costs of defense of the Dog Museum's action." (Defs.' Mem. of Law at 26.) In addition, Defendants assert that the Dog Museum's recovery should be restricted to the alleged losses directly caused by the co-trustee's payment to the IRS. Plaintiffs maintain that there is no basis for limiting the recovery in this action.
The language of the settlement agreement provides:
 "[u]pon entry of the Judgment, and in addition to the obligations imposed upon Ragosta and O'Neil pursuant to such judgment, Ragosta only shall pay to the Dog Museum the total amount of $225,000 consisting of an immediate cash payment of $50,000 and a non-interest bearing note for $175,000 payable in annual installments of $17,500 each for ten years . . . The payments detailed in this paragraph shall be deemed made in settlement of disputed claims against Ragosta and O'Neil for any and all liability arising from Ragosta and O'Neil's acts as Co-Trustees of the Unitrust not specifically detailed in the Findings of Fact and Judgment including acts, if any, which are later determined to be excluded from coverage under the National Casualty policy." (Settlement Agreement at 3.)
However, the Judgment entered against Ragosta and O'Neil provides that "[t]he sum of Nine Hundred Thousand Dollars ($900,000) shall be awarded as compensatory damages to the Dog Museum against both defendants, jointly and severally, plus statutory interest from the date of the Hopkinton sale transaction (August 1992) and costs." (Dog Museum Litigation I at 5.) Thus, the plain language of the settlement agreement states that Ragosta's $225,000 payment is only part of his obligation under the judgment. Ragosta remains personally liable for the entire $900,000 judgment assessed against him and co-trustee O'Neil.
In addition, Defendants' argument that Plaintiffs' recovery should be limited to the alleged losses suffered as a result of the tax deficiency payment to the IRS is based on mistaken belief that there is no duty of care owed by a trustee's attorney to the beneficiaries of a trust. However, given this Court's determination that such a duty of care exists, the trust beneficiaries are entitled to seek recovery for damages they sustained as a result of Defendants' negligence and breach of fiduciary duty.
 Conclusion
This Court will grant a motion for summary judgment when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. A review of the arguments advanced by counsel and of all other materials properly before this Court reveals that there are genuine issues of material fact that preclude the grant of summary judgment in the instant matter.
Counsel shall submit an appropriate order and judgment for entry.
[1] O'Neil stated: "[h]ad she done something like this before? Yes. She'd always come back." (O'Neil Dep. 10/19/00 at 91.) Ragosta testified that after Lyman's disappearance in July 1987, O'Neil informed him that Lyman would mysteriously disappear from time to time. (Ragosta Dep. 1/19/01 at 36.)
[2] Ragosta Dep. on 1/19/01 at 45-46. Ragosta testified "I am uncertain as to whether or not they initiated a court proceeding in Massachusetts to compel the trustees or simply entered an appearance and vehemently objected to actions that had been brought by the trustees in Massachusetts." Id. at 47.
[3] Id. at 56-58. This court notes that testimony of Ragosta and O'Neil conflict on this issue and on several other matters. Ragosta insists that O'Neil had no intention of producing any financial documents to Massachusetts Trustees. (Ragosta Dep. on 1/19/01 at 49.) Ragosta testified that it was O'Neil's "position from day one . . . that he felt it was none of their business and he had no intention of producing it and was not interested in — he felt it almost was like a betrayal to her to reveal her personal life to the family and didn't understand the issue; didn't understand why we had to do that and just wouldn't hear of it." Id. at 52. O'Neil, however, testified that he did not recall the Massachusetts Trustees moving to compel for an accounting. (O'Neil Dep. on 11/15/00 at 104.) Rather, he relied on Ragosta to handle these matters. O'Neil stated that Ragosta "didn't do much" with respect to this motion "[e]xcept tell [him] he's taking care of it; don't worry about it." Id. at 106.
[4] Ragosta testified that he did not consult with Defendants regarding the 1989 transfer of Lyman's Hopkinton property into the Unitrust. (Ragosta Dep. 7/12/02 at 62 and Ragosta Dep. on 1/19/01 at 117.) In addition, Ragosta's belief that he could exceed the eight percent limitation on the trust and replenish any deficiency in the future was based on advice "some other attorney that was involved in trust law that [he] spoke with and had asked ." (Ragosta Dep. 7/12/02 at 113.)
[5] The Probate Court wrote "aside from the facts that her whereabouts is unknown, some somewhat disturbing facts surround her absence and are not to my knowledge satisfactorily resolved." Id. at 3. The Court found the "[t]estimony of Mr. O'Neill is not wholly credible." Id. at 4. Moreover, "the circumstances surrounding Lyman's disappearance as described by Mr. O'Neill are sketchy, and his actions for a long period of time thereafter are unsettling." Id. at 4.
[6] Super. R. Civ. P. 44.1 states that "[a] party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice." Although the rule specifically mentions the law of a foreign country, the Committee notes clarify that the intention was to require notice in any case involving law of a foreign country or state.
[7] The tumult caused by the prospect of expanding the duty of care owed by a trustee's attorney to include the beneficiaries of the trust is not unexpected. Numerous concerns are typically raised when a court seeks to expand the duty of care owed by a professional, such as an attorney or accountant, to other than his direct client. For example, in holding that accountants were free from liability for their negligence, Judge Cardozo wrote:
 "[i]f liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class. The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes one to these consequences." Ultramares v. Touche Co., 174, N.E. 441, 444 (19__).
Nonetheless, in the seminal case Rusch Factors, Inc. v. Levin,284 F. Supp. 85, 92-93 (D.R.I. 1968), the United States District Court for the District of Rhode Island held that "an accountant should be liable in negligence for careless financial misrepresentations relied upon by actually foreseen and limited classes of persons." In Rusch, the defendant accountant sought to dismiss an action brought by a New York commercial banking and factoring company that had relied upon financial statements prepared by the defendant, which represented that a Rhode Island corporation was solvent. Id. at 86. The plaintiff relied upon these statements in extending the corporation a loan in excess of $337,000.00. Id. at 87. The corporation subsequently went into receivership and the plaintiff was able to recover only a portion of its loan. Id. The District Court held that "an accountant should be liable in negligence for careless financial misrepresentations relied upon by actually foreseen and limited classes of persons." Id. at 92-93. In seeking to extend the duty of care owed by the trustee's attorney to include the beneficiaries of the trust, the instant Plaintiffs appear to argue that similar to the plaintiff in Rusch, the Dog Museum is "a single party whose reliance was actually foreseen by the defendant." Id. at 91.
[8] In Forte Brothers v. National Amusements, Inc., 525 A.2d 1301, 1303 (R.I. 1987), the Rhode Island Supreme Court wrote "[a]n action in negligence is maintained when the plaintiff shows that the defendant breached a duty of care owed to the plaintiff and that the breach proximately caused an injury to the plaintiff resulting in actual damages. There is no requirement of privity in Rhode Island to maintain an action in tort." Id.
[9] In Banks v. Bowen's Landing Corp., 522 A.2d 1222 (R.I. 1987), the Court stated:
 "[i]n considering whether a duty exists, among the factors considered are (1) the foreseeability of harm to the plaintiff, (2) the degree of certainty that the plaintiff suffered an injury, (3) the closeness of connection between the defendant's conduct and the injury suffered, (4) the policy of preventing future harm, and (5) the extent of the burden to the defendant and the consequences to the community for imposing a duty to exercise care with resulting liability for breach." Id. at 1225 (citing Thompson v. County of Alameda, 27 Cal.3d 741, 750, 614 P.2d 728, 732-33, 167 Cal.Rptr. 70, 74-75 (1980)).